# United States Court of Appeals
## For the First Circuit

No. 10-2293

UNITED STATES OF AMERICA,

Appellee,

v.

CHARLES D. STERGIOS,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

[Hon. George Z. Singal, U.S. District Judge]

Before

Lynch, Chief Judge,
Boudin and Stahl, Circuit Judges.

Raymond J. Rigat, by Appointment of the Court, for appellant.
Margaret D. McGaughey, Appellate Chief, with whom Thomas E.
Delahanty, II, United States Attorney, was on brief for appellee.

October 18, 2011

**STAHL**, **Circuit Judge**.  In July 2010, a jury convicted Defendant-Appellant Charles D. Stergios of two counts of bank fraud and one count of mail fraud.  Stergios appeals the jury's findings that the banks he defrauded were FDIC insured (an element of bank fraud) and that he used the United States mails to perpetrate his frauds (an element of mail fraud).  He also appeals restrictions on his internet usage that the district court imposed as part of his supervised release, as well as the district court's inclusion of a counterfeit $1.4 million check in its calculation of loss supporting Stergios's 80-month sentence.  We affirm.

## I. Facts & Background

The 2010 convictions for bank and mail fraud that Stergios challenges here were not his first.  In April 2005, after pleading guilty before Judge Singal to charges of wire, mail, and bank fraud, Stergios was sentenced to 75 months of incarceration, followed by five years of supervised release.  On June 24, 2009, to complete his prison sentence, Stergios was transferred to Pharos House, a residential reentry center in Portland, Maine.  About a month later, he was given permission to move to his mother and stepfather's home in Brunswick, Maine, through Pharos House's home confinement program.  As a condition of his supervision, he was not allowed to possess a computer or access the internet.

Nevertheless, between July 2, 2009 and August 24, 2009, while living at Pharos House and at his parents' house on home

-2-

confinement, Stergios used the internet and other means to attempt to obtain money by false pretenses from Maine Bank & Trust (MB&T)[1] and USAA Bank (USAA). His was a variation on the classic check kiting scheme. He opened several bank accounts in person and online, apparently only two of which were opened with legitimate, but small, deposits. Thereafter, he inflated the value of those accounts by depositing checks drawn from closed accounts and accounts with insufficient funds, making fraudulent wire transfers, and depositing empty envelopes purporting to contain cash. Stergios then extracted money from the accounts by transferring funds between them, withdrawing money from tellers and ATMs, writing checks drawn from the accounts, and making purchases online and in person using debit cards issued for the accounts.

On January 20, 2010, Stergios was charged in a four-count superseding indictment. Count 1 charged bank fraud against MB&T, in violation of 18 U.S.C. § 1344. Count 2 charged bank fraud against USAA. Count 3 charged mail fraud involving USAA, in violation of 18 U.S.C. § 1341. Count 4, which alleged escape from custody, was severed from the other charges. Stergios thus found himself once again before Judge Singal on July 19, 2010, for a jury trial on Counts 1, 2, and 3.

---

[1] Due to a merger effective January 1, 2009, MB&T is now known as Peoples United Bank.

At the outset of trial, Stergios argued that, in the absence of a certificate from the Federal Deposit Insurance Corporation (FDIC), the testimony of an MB&T representative was insufficient to prove that MB&T was FDIC insured at the time of Stergios's crimes, as required by 18 U.S.C. § 1344. The government presented two forms of evidence with respect to each bank's FDIC-insured status. First, a bank representative testified that the bank was FDIC insured.[2] Stergios objected to some of this testimony but not specifically to the bank representatives' qualifications to provide the testimony. Second, the government offered official copies of the banks' FDIC insurance certificates. Each certificate was accompanied by an affidavit from Valerie J. Best, Assistant Executive Secretary of the FDIC and custodian of FDIC records, authenticating the certificate and stating that the FDIC had no record of either bank's coverage having been terminated since the date on the certificate.[3] Stergios did not object to these certificates or the accompanying affidavits.

Stergios also argued at the outset of trial that there was no evidence that he had caused any specific item to be mailed,

---

[2] Two MB&T representatives further testified that the bank displays generic certificates of FDIC insurance in its branch lobbies. The USAA representative testified that the bank displays documentation of its FDIC insurance in its lobby, includes notice of the insurance on its statements, and that she had seen USAA listed as a federally-insured bank on the FDIC's website.

[3] The government provided a similar certificate and affidavit for Peoples United Bank, given the 2009 merger.

as required by 18 U.S.C. § 1341, and thus that Count 3, accusing him of mail fraud, should be dismissed. The government presented evidence that Stergios had opened four accounts with USAA between July 26, 2009 and August 3, 2009, while he was living in Maine. Upon opening those accounts, Stergios had requested debit or ATM cards for all four of the accounts, and USAA had mailed those cards to him.

Gwendolyn Westrup, a fraud investigator for USAA, testified that USAA has no branch offices and does business exclusively by mail, over the telephone, and online. She further testified that the bank's practice is to send all debit and ATM cards by mail. The government also presented evidence that Stergios used the debit and ATM cards to perpetrate his frauds, by checking his account balances, making charges, and withdrawing funds. Stergios made all of the charges in places other than Indiana (the location from which USAA mailed the cards) and Texas (where the bank is based), which the government argued was evidence that USAA must have mailed the cards to Stergios.

After deliberating for two hours, the jury found Stergios guilty as charged on Counts 1, 2, and 3. The following day, Stergios pled guilty to Count 4.

At sentencing, over Stergios's objection, Judge Singal included as relevant conduct an additional fraud detailed in Stergios's report of presentence investigation (PSI). According to

the PSI, on August 18, 2009, an applicant giving the name Thomas Brooks opened a USAA checking account over the phone. Thomas Brooks was the name Stergios had used when committing his 2005 offenses. The applicant also provided an email address that Stergios had used in opening one of the USAA accounts included in the 2009 indictment. On August 20, 2009, a $1.4 million check originating from a TD Bank account in the name of GoldmanSager was mailed to Thomas Brooks's USAA account. The same day, USAA received a $1.2 million check made payable to Stergios from the Brooks account.[4] Though the $1.4 million check did not result in any actual loss, Judge Singal included it as intended loss in his offense calculation.

Judge Singal therefore found that Stergios's base offense level under the Sentencing Guidelines was 7, and that the loss amount of $1,488,233.93 raised the offense level to 23. Given that Stergios had a Criminal History Category of IV, that resulted in a Guideline range of 70 to 87 months. Having considered the Guidelines, Judge Singal gave them no controlling weight and sentenced Stergios to three concurrent terms of 80 months on Counts 1 through 3, to be served concurrently with a 60-month sentence on Count 4. In addition, Judge Singal imposed concurrent terms of

---

[4] As the government explained in its sentencing memorandum, it had not included the $1.4 million check in the indictment because none of the relevant events occurred in Maine. (Stergios had improperly relocated to New York by this point.)

five years of supervised release for Counts 1 and 2, to be served concurrently with three years of supervision on Counts 3 and 4.

Judge Singal also imposed two special conditions of supervised release to which Stergios objected.  Special Condition 7 limited Stergios's use of computers and access to the internet.[5]  Special Condition 8 required Stergios to participate in a computer and internet monitoring program, which included periodic unannounced inspections of his computer, storage media, and other electronic or internet-capable devices by his probation officer, based upon a reasonable suspicion of contraband evidence or violation of supervision.[6]  As the text of Special Condition 8 made clear, the program could result in partial or full restriction of Stergios's internet usage.

---

[5] Special Condition 7 read as follows: "Subject always to review by the sentencing judge upon request by either the defendant or the government, the Defendant shall not possess or use a computer to access an online 'computer service' at any location, including his employment, without the supervising officer's prior approval.  This includes any Internet service provider, bulletin board system or any other public or private computer network."

[6] Special Condition 8 read as follows: "Defendant shall participate and comply with the requirements of the Computer and Internet Monitoring Program (which may include partial or full restriction of computer(s), internet/intranet, and/or internet capable devices), and shall pay for services, directly to the monitoring company.  The defendant shall submit to periodic unannounced examinations of his/her computer(s), storage media, and/or other electronic or internet capable device(s) performed by the probation officer based on reasonable suspicion of contraband evidence or a violation of supervision.  This may include the retrieval and copying of any prohibited data and/or the removal of such system(s) for the purpose of conducting a more thorough inspection."

## II. Discussion

Stergios raises four issues on appeal. First, he argues that there was insufficient evidence for the jury to find that the banks he defrauded, MB&T and USAA, were FDIC insured. Second, he argues that there was insufficient evidence for the jury to find that he caused the United States mails to be used in furtherance of his scheme to defraud. Third, he argues that the district court abused its discretion by imposing special conditions of release restricting his use of the internet. Fourth, he argues that the district court erred by including the counterfeit $1.4 million check in its calculation of Stergios's intended loss amount.

### 1. FDIC Insurance

Stergios first argues that the government failed to prove beyond a reasonable doubt that MB&T and USAA were FDIC insured, "a jurisdictional prerequisite as well as a substantive element" of bank fraud under 18 U.S.C. § 1344. United States v. Ayewoh, 627 F.3d 914, 917 (1st Cir. 2010). We review the preserved portion of Stergios's challenge to the sufficiency of the evidence de novo but consider that evidence in the light most favorable to the prosecution. Id.

Stergios contends that the bank representatives' testimony, the FDIC insurance certificates, and the accompanying affidavits from the FDIC records custodian were inadequate to demonstrate FDIC insurance at the time of his crimes in 2009.

Previously, we have upheld against a sufficiency-of-the-evidence challenge the testimony of a bank official, standing alone. See United States v. Vachon, 869 F.2d 653, 657 (1st Cir. 1989). We have also upheld evidence of an FDIC certificate, authenticated by testimony from the bank's records custodian. See Ayewoh, 627 F.3d at 919-20. As a general matter, we have found that "with evidence of FDIC insurance both at a time predating the offense and at the time of trial, a reasonable jury could infer that, absent evidence to the contrary, the bank was insured on the date of the crime." Id. at 920. Here, for each bank, the government presented: (1) the testimony of a bank official confirming that the bank was federally insured at the time of trial;[7] and (2) an FDIC certificate predating the offense, accompanied by an affidavit certifying that the FDIC had no record of termination of the bank's insurance.[8] That was ample evidence for the jury to conclude that MB&T and USAA were FDIC insured. See id.

Stergios also raises two specific challenges to the evidence, neither of which was properly preserved at trial. We

---

[7] Joan Voyer, a customer service representative for MB&T, also testified that MB&T was insured at the time of Stergios's crimes in 2009. Gwendolyn Westrup, the USAA fraud investigator, testified that USAA has "always" been insured by the FDIC. Stergios objected when the government asked Ms. Westrup whether USAA was insured during the summer of 2009, and the court sustained the objection on the grounds that Ms. Westrup had already testified that the bank had always been federally insured.

[8] Termination of FDIC insurance is of course "an exceedingly rare event in the banking industry." Ayewoh, 627 F.3d at 918.

-9-

need not, however, analyze whether Stergios has demonstrated plain error, see United States v. Olano, 507 U.S. 725, 732 (1993), because we find no merit to these challenges under any standard of review. First, Stergios argues that, because she was not a bank manager, MB&T customer service representative Joan Voyer did not have adequate personal knowledge of MB&T's FDIC insurance.[9] But to establish FDIC insurance, "courts have tended to accept any bank employee's testimony as sufficient, regardless of whether that employee was in a managerial position." Ayewoh, 627 F.3d at 919. Second, Stergios contends that the certificates and affidavits were insufficient to establish FDIC insurance at the time of his offenses, because those documents merely certified that the banks had been insured prior to 2009 and that there was no evidence of termination of insurance. Putting aside Stergios's failure to object to the certificates and affidavits at trial, we find that a reasonable jury could have inferred, from the certificates and affidavits alone or in combination with the bank representatives' testimony, that the banks were FDIC insured at the time of Stergios's crimes. See id. at 917-20.[10]

---

[9] At trial, Stergios objected to the foundation for Ms. Voyer's testimony that MB&T was FDIC insured in 2009, but he did not object to her qualification to provide that testimony.

[10] In Ayewoh, the government presented two forms of evidence of FDIC insurance: (1) an FDIC certificate issued to the bank in 1999; and (2) testimony by the bank's records custodian that the certificate was "the [FDIC] certificate issued to [the bank] on January 1999." 627 F.3d at 917. Viewing the testimony in the

## 2. Use of the Mails

Next, Stergios argues that the government failed to prove beyond a reasonable doubt that he caused the United States mails to be used in furtherance of his scheme to defraud, as required by 18 U.S.C. § 1341.  Again, we review this challenge de novo but consider the evidence and reasonable inferences in the light most favorable to the prosecution.  Ayewoh, 627 F.3d at 917.

The elements of mail fraud are: (1) devising or attempting to devise a scheme or artifice to defraud; (2) knowing and willful participation in the scheme with the specific intent to defraud; and (3) the use of the United States mails in furtherance of that scheme.  United States v. Montminy, 936 F.2d 626, 627 (1st Cir. 1991).  The defendant "need not personally mail anything so long as it is reasonably foreseeable that the mails will be used in the ordinary course of business to further the scheme."  United States v. Cacho-Bonilla, 404 F.3d 84, 90 (1st Cir. 2005).  Only the third element -- the "in furtherance" requirement -- is at issue here.  Stergios argues that the mailing of USAA's debit and ATM cards was not an act in furtherance of his scheme to defraud USAA.

"The courts have generously construed the 'furtherance' requirement" of the mail fraud statute.  Id. at 91.  For that

---

light most favorable to the government, we found that a reasonable jury could have interpreted the testimony as a statement that the certificate indicated the bank's presently-insured status as of the date of trial, and we found the evidence sufficient.  Id. at 920.

requirement to be met, the use of the mails need not be an essential element of the scheme but need only be "incident to an essential part of the scheme" or "a step in the plot." Schmuck v. United States, 489 U.S. 705, 710-11 (1989) (internal quotation marks omitted).

A reasonable jury could have found that standard easily satisfied here. The government presented evidence that Stergios caused the mails to be used at least four times, when he requested and was mailed debit and ATM cards from USAA. The USAA fraud investigator testified that USAA did business exclusively by mail and that the bank's practice was to send ATM and debit cards by mail. The government also presented evidence that Stergios used the cards in furtherance of his scheme and made charges in places other than Indiana (the location from which USAA mailed the cards) and Texas (where the bank is based). Assessing that evidence, the jury could reasonably have concluded that USAA sent the cards to Stergios by mail and that the cards were "incident to an essential part" of Stergios's scheme. Id. at 711. Without the ATM and debit cards, Stergios could not have made certain fraudulent charges or withdrawn funds that did not belong to him.

**3. The Special Conditions**

Stergios also questions the legality of two special conditions of release that the district court imposed at sentencing. We review a preserved challenge to a condition of

release for abuse of discretion. United States v. Perazza-Mercado, 553 F.3d 65, 69 (1st Cir. 2009) (citing United States v. York, 357 F.3d 14, 19 (1st Cir. 2004)).

The statute that governs supervised release terms, 18 U.S.C. § 3583, provides discretion for sentencing courts to impose certain special conditions of release. In this case, the district court imposed two special conditions to which Stergios objects. Special Condition 7 limits Stergios's use of computers and access to the internet. Special Condition 8 requires Stergios to participate in a computer and internet monitoring program, which includes periodic unannounced inspections of his computer, storage media, and other electronic or internet-capable devices by his probation officer based upon a reasonable suspicion of contraband evidence or violation of supervision.

To assess the validity of a condition of supervised release, we apply 18 U.S.C. § 3583(d) and U.S.S.G. § 5D1.3(b), "which require that special conditions cause no greater deprivation of liberty than is reasonably necessary to achieve the goals of supervised release, and that the conditions be reasonably related both to these goals and to the nature and circumstances of the offense and the history and characteristics of the defendant." Perazza-Mercado, 553 F.3d at 69 (internal citations and quotation

marks omitted).[11]  Stergios argues that the district court imposed what amounts to a total ban on his internet usage both at home and at work, which is a greater deprivation than is necessary to achieve the goals of supervised release.  Stergios has, however, mischaracterized the special conditions.

Special Condition 7 allows Stergios to use a computer and access the internet, as long as he obtains his supervising officer's approval.  The condition is "[s]ubject always to review by the sentencing judge upon request by either the defendant or the Government."  Stergios argues that Special Condition 7 might prevent him from using a telephone upon his release, because he believes telephones will all be connected to an internet service provider at that point.  We choose not to speculate as to how technologies will develop in the years to come, nor are we convinced that Stergios's use of a telephone would fall within Special Condition 7's prohibition on "possess[ing] or us[ing] a computer to access an online 'computer service.'"  Should Stergios find Special Condition 7 unduly restrictive upon his release, he need only speak with his supervising officer and, if that does not succeed, raise the issue with the district court.

---

[11] The goals of supervised release are substantially the same as the goals of sentencing: (a) to deter criminal conduct; (b) to protect the public from further crimes by the defendant; and (c) to provide the defendant with training, medical care, or correctional treatment as effectively as possible.  See 18 U.S.C. § 3583(c), (d)(1).

Nor is Special Condition 8 unduly restrictive, as defense counsel conceded at oral argument. That condition requires Stergios to participate in the Computer and Internet Monitoring Program, as part of which he must submit to unannounced examinations of his computer and other electronic or internet-capable devices when his probation officer has a reasonable suspicion of contraband evidence or that Stergios has violated a condition of supervision. As we noted in United States v. Sebastian, 612 F.3d 47, 52 (1st Cir. 2010), "[i]f the district court could not mandate compliance with the rules of the treatment program, the required participation would be ineffectual."

Both special conditions are reasonably related to the goals of supervised release, to the nature and circumstances of the offense, and to the history and characteristics of the defendant. Perazza-Mercado, 553 F.3d at 69. Stergios relied heavily on the internet to perpetrate his frauds, including opening two checking accounts online through USAA, opening another using an email address, and conducting a number of electronic money transfers. Moreover, Stergios had a history of using the internet to commit crimes. Stergios's 2005 conviction involved hundreds of fraudulent internet transactions on eBay, totaling over $421,000.00. It was therefore reasonable for the district court to find, the second time around, that restrictions on Stergios's internet usage were necessary to deter him from committing further crimes.

-15-

This case is distinguishable from <u>Perazza-Mercado</u>, in which the sentencing court imposed a total ban on the defendant's residential internet usage though the defendant had no particular history of using the internet to commit crimes. 553 F.3d at 70. We found that restriction "inconsistent with the vocational and educational goals of supervised release," <u>id.</u> at 72, but remanded for the district court to devise a more limited internet restriction, <u>id.</u> at 74. We emphasized the lack of nexus between the defendant's crimes and the internet:

> [O]ur sister circuits have upheld broad restrictions on internet access as a condition of supervised release where (1) the defendant used the internet in the underlying offense; (2) the defendant had a history of improperly using the internet to engage in illegal conduct; or (3) particular and identifiable characteristics of the defendant suggested that such a restriction was warranted.

<u>Id.</u> at 70. Here, Stergios used the internet as part of the underlying offense, had a history of improperly using the internet to engage in fraud, and his status as a repeat offender suggested that an internet restriction was warranted. There was no abuse of discretion.

**4. The $1.4 Million Check**

Finally, Stergios claims that the district court should not have included the fraudulent $1.4 million check described in his PSI when calculating the loss amount, because that check did not result in actual loss and his mental state was such that he did

-16-

not intend for any loss to occur.[12]  We review the district court's interpretation and application of the Sentencing Guidelines de novo, but we review for clear error the factual findings upon which the district court based its loss determination.  <u>United States</u> v. <u>Innarelli</u>, 524 F.3d 286, 290 (1st Cir. 2008).

Sentencing Guideline Section 2B1.1 governs offenses involving fraud or deceit and allows for a 16-level increase above base offense level 7 when the loss occasioned by an offense is greater than $1 million.  <u>See</u> U.S.S.G. § 2B1.1(b)(1)(I).  The commentary to the Guidelines instructs a sentencing court to consider "the greater of actual loss or intended loss" when computing loss amounts.  <u>Id.</u> § 2B1.1, cmt. n.3(A).  Intended loss "is a term of art meaning the loss the defendant reasonably expected to occur at the time he perpetrated the fraud."  <u>Innarelli</u>, 524 F.3d at 290.  "[W]e focus our loss inquiry for purposes of determining a defendant's offense level on the objectively reasonable expectation of a person in his position at

---

[12] Importantly, Stergios does not contend that he did not write the $1.4 million check, nor does he question the district court's interpretation of the Sentencing Guidelines or the district court's factual finding that the $1.4 million check qualified as relevant conduct.  Uncharged conduct is relevant to the offense of conviction "if the government proves by a preponderance of the evidence that such uncharged conduct is part of the same course of conduct or common scheme or plan as the charged conduct."  <u>United States</u> v. <u>Eisom</u>, 585 F.3d 552, 557 (1st Cir. 2009).  Stergios does not allege that the government failed to meet that burden.

the time he perpetrated the fraud, not on his subjective intentions or hopes." Id. at 291.

Stergios argued at sentencing that the $1.4 million check was a "fantasy manic extreme" brought about by his untreated bipolar disorder and that he did not intend for any loss to occur as a result of the check. However, the district court found that the check was "a genuine result of Mr. Stergios believing that he had gotten away with things thus far and was ready for greater things." The court did not believe Stergios had been motivated by his bipolar disorder:

> [M]y view is that the conduct with regard to the last check here wasn't a result of his lack of medication, wasn't a result of his grandiosity that the prior checks -- prior activities were working for the most part.
>
> In my view, his conduct in paragraph 19 was part of a spree and ongoing series of offenses, one with a similar purpose and similar modus operandi. I think there is a degree of similarity. I think the methodology involved, the close time interval, that makes it relevant conduct.

What the court found particularly "troubling" was "what to do with Mr. Stergios given his past history and the prior offenses." As the PSI detailed, Stergios had a relatively extensive criminal history, including the 2005 conviction. The court emphasized that Stergios had not even finished his sentence for the 2005 conviction when he began engaging in the 2009 crimes, which indicated "a genuine feeling that the laws of society don't apply to you. That

-18-

you know better than other people and you're going to do whatever you want to do." Given Stergios's prior misconduct, the court noted that it could sentence Stergios above the guideline range, with or without the $1.4 million check factored in.

We recognize that the district court's inclusion of the $1.4 million check in its loss calculation may have resulted in a higher sentence for Stergios than he would otherwise have received,[13] but "a party dissatisfied with the sentencing court's quantification of the amount of loss in a particular case must go a long way to demonstrate that the finding is clearly erroneous." United States v. Rostoff, 53 F.3d 398, 407 (1st Cir. 1995). Sentencing judges must receive "wide berth" in determining what information is sufficiently reliable to be used at sentencing. Id. Stergios has given us no reason to question the district court's conclusion here. Furthermore, Stergios's subjective state of mind at the time of his offenses is not what governs. Rather, we must ask whether an objectively reasonable person would have intended for the $1.4 million check to cause loss. Innarelli, 524 F.3d at 291. Under either analysis, we find that the district court did not commit clear error.

### III. Conclusion

For the foregoing reasons, we AFFIRM.

---

[13] Absent the check, Stergios's Sentencing Guideline range was 27 to 46 months; with the check, it was 70 to 87 months.

-19-