# United States Court of Appeals
## For the First Circuit

No. 11-2150

UNITED STATES OF AMERICA,

Appellee,

v.

ALBANIA DELEON,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
[Hon. Nathaniel M. Gorton, U.S. District Judge]

Before

Boudin,[*] Selya, and Stahl,
Circuit Judges.

Jessica Hedges, with whom Hedges & Tumposky, LLP was on brief,
for appellant.
Lori J. Holik, Assistant United States Attorney, with whom
Carmen M. Ortiz, United States Attorney, was on brief, for
appellee.

January 11, 2013

---

[*] Judge Boudin heard oral argument in this matter and
participated in the semble, but he did not participate in the
issuance of the panel's opinion in this case. The remaining two
panelists have issued the opinion pursuant to 28 U.S.C. § 46(d).

**STAHL**, **Circuit Judge**. In November 2008, a jury found defendant-appellant Albania Deleon guilty of having, among other things, engaged in a scheme to conceal and avoid her company's employment tax liability. The district court concluded that Deleon was responsible for just over $1.2 million in tax losses, and she received a sentence of eighty-seven months. On appeal, she raises three challenges to her conviction and sentence, arguing that the court erred by: (1) submitting a set of summary charts to the jury; (2) adopting the government's loss calculation; and (3) failing to inquire specifically as to whether she had reviewed the presentence report (PSR) with her attorney. We affirm.

## I. Facts & Background

The full scope of Deleon's criminal scheme was broader than what we are about to describe; we recite only the facts that are relevant to this appeal.

Deleon owned and operated two businesses: Environmental Compliance Training, an asbestos abatement training school, and Methuen Staffing, Inc., a temporary employment agency that supplied workers, generally to asbestos abatement businesses, for an hourly fee. Though Deleon represented to client companies and the Massachusetts Division of Occupational Safety that Methuen Staffing would be responsible for all employee tax obligations, she in fact concealed much of Methuen Staffing's tax liability by maintaining two separate payrolls. Methuen Staffing paid a minority of its

employees through a payroll service; for those employees, compensation was reported and payroll taxes were withheld. We will refer to this as the "reported payroll." A majority of Methuen Staffing's employees, however, were on what we will call the "unreported payroll."[1] Methuen Staffing paid these workers directly with checks and did not withhold payroll taxes from their wages or report or remit such taxes to the Internal Revenue Service (IRS). Rather, Deleon told her tax preparers that the unreported payroll workers were independent contractors for whom she was not required to remit payroll taxes. Thus, Deleon's tax preparers recorded the checks to individuals on the unreported payroll as a business expense and issued an IRS Form 1099 to each of those workers.[2]

State and federal investigators, alerted to potential document fraud and immigration violations at both of Deleon's companies, raided the companies' offices in November 2006. In March 2008, Deleon was charged with: one count of conspiracy to violate multiple federal criminal laws, in violation of 18 U.S.C. § 371; five counts of making false statements, in violation of 18 U.S.C. § 1001; sixteen counts of procuring false tax returns, in

---

[1] The testimony at trial indicated that, within Methuen Staffing, payments made to workers on the unreported payroll were also referred to as "1099 checks" and "under the table" checks.

[2] Methuen Staffing also concealed the unreported payroll from its workers' compensation insurance provider.

violation of 26 U.S.C. § 7206(2); and six counts of mail fraud, in violation of 18 U.S.C. § 1341. After an eleven-day jury trial, she was convicted on all counts.

## II. Analysis

### A. The chalks

Deleon's first argument is that the district court improperly submitted to the jury three summary charts that the government had used as "chalks," or demonstrative jury aids, at trial.[3] Because her trial counsel explicitly consented to the submission of the chalks, however, Deleon's claim is waived, and we need not address its merits.

On November 19, 2008, after the jury had begun its deliberations, the district court alerted the parties that the jury had submitted the following question to the court: "Would it be possible to have the exhibit numbers indicated on the verdict form. Given the number of counts and amount of evidence, it would be helpful." The district court noted that the exhibit numbers were listed on the chalks, which were not in evidence and thus not in the jury room, and asked the parties for their input.

---

[3] The chalks were labeled "False Statement Counts," "False Tax Return Counts," and "Mail Fraud Counts." They largely duplicated charts included in the superseding indictment, which listed each group of counts against Deleon and relevant information related to those counts. The chalks did, however, have one additional column listing the trial evidence admitted in support of each count.

The government suggested that the court give the chalks to the jury. Defense counsel responded, "I don't have a problem with that," but indicated that he wanted to review the copies of the chalks in his file to confirm that (as the government had indicated) the chalks did not reflect anything more than the counts in the indictment and the exhibits that related to each count.[4] The record is unclear as to whether defense counsel in fact examined the chalks, but he did proceed to say, "Your Honor, I'm fine with that. We were just talking about it." The court then had a brief discussion with the government about obtaining the original chalks and bringing them to the courtroom. Finally, the court had the following exchange with the parties:

> The Court: All right. Is there any reason that the Court just simply can't submit those chalks in response without calling the jury back in and doing it on --
>
> Government counsel: I don't think so.
>
> The Court: What I will do then, as soon as you get the chalks and run them by [defense counsel] that he agrees --
>
> Defense counsel: I'm satisfied, your Honor.
>
> The Court: Give me those three chalks. I will give them to the deputy, who will turn them over to the marshal, who will give them to the jury.

---

[4] The "False Tax Return Counts" chalk actually included not exhibit numbers but calculations that an IRS revenue agent had made and testified to at trial.

Deleon's trial counsel thus made three statements indicating his acquiescence: "I don't have a problem with that" when the government initially proposed the plan, and then, after either looking at the chalks or simply conferring with the government, "Your Honor, I'm fine with that" and "I'm satisfied, your Honor."  That is a quintessential example of "[t]he intentional relinquishment of a known right," which "results in a waiver" and makes Deleon's claim unreviewable on appeal. United States v. Carrasco-De-Jesús, 589 F.3d 22, 26 (1st Cir. 2009). Though we may, on rare occasions, forgive waivers solely as a matter of discretion, United States v. Walker, 665 F.3d 212, 227 (1st Cir. 2011), we see no reason to do so here.

## B.  The loss calculation

Deleon's second broad challenge is to the district court's calculation of the tax losses for which she should be held responsible as a result of her fraudulent payroll scheme.  We review for clear error the factual findings upon which a district court has based its loss calculation.  United States v. Stergios, 659 F.3d 127, 135 (1st Cir. 2011).  Calculating loss "is more an art than a science," United States v. Rostoff, 53 F.3d 398, 407 (1st Cir. 1995), and the district court need only make a reasonable estimate, United States v. Mitrano, 658 F.3d 117, 124 (1st Cir. 2011); U.S.S.G. § 2T1.1, Application Note 1.

One of the government's witnesses at trial was IRS Revenue Agent Joseph Guidoboni, who was tasked with calculating the payroll taxes that Methuen Staffing owed for tax years 2002 through 2005. Agent Guidoboni reviewed Methuen Staffing's quarterly payroll tax returns, the records of the two payroll services that Methuen Staffing used, the checks issued to workers on the unreported payroll, and Methuen Staffing's bank statements. He determined that Methuen Staffing's gross unreported payroll totaled $4,560,965.67 but that the company had reported only $1,772,619.07 in gross payroll. Agent Guidoboni then applied calculations discussed at more length below to determine the taxes due and owing. He reached a total tax loss figure of $1,074,858.70 for the years 2002 through 2005. That figure was increased to $1,200,939.45 after trial, when the government obtained additional information for tax year 2001.

In advance of her sentencing hearing, Deleon submitted an expert report that challenged two of the assumptions underlying Agent Guidoboni's calculations and suggested that he had overestimated the tax losses. Deleon did not, however, put forward an alternate calculation. After continuing an initial sentencing hearing to have the government file a response to Deleon's expert's criticisms, the district court ultimately adopted the government's estimate. The court found by a preponderance of the evidence that "[n]otwithstanding defense counsel's . . . vigorous arguments and

submissions," Deleon should be held responsible for just over $1.2 million in tax losses. The court emphasized that Application Note 1 to U.S.S.G. § 2T1.1 directs a sentencing court to "make a reasonable estimate based on the available facts" when the loss amount is uncertain. With a total offense level of 29 and a criminal history category of I, Deleon's guideline sentencing range was 87 to 108 months; the court imposed a sentence of 87 months.

Deleon finds three flaws in the government's loss calculation and thus alleges that it was clear error for the district court to adopt it.

First, she challenges the government's assumption that all individuals who were paid through Methuen Staffing's unreported payroll should be treated as W-2 employees for the purpose of calculating tax liability. Some, she claims, may have actually been properly characterized as 1099 workers, and the IRS should therefore have located and interviewed a "representative sample" of Methuen Staffing's unreported payroll workers. But Agent Guidoboni's assumption that the payments from the unreported payroll were made to employees and not independent contractors was supported by evidence at trial indicating that: the decision to put an individual on the unreported payroll had nothing to do with the type of work that person performed; workers determined for themselves how they wanted to be paid; and workers regularly alternated between the reported and unreported payrolls. Deleon

has, on the other hand, pointed to no evidence in the record of properly characterized 1099 employees at Methuen Staffing.

Deleon's sentencing counsel was apparently able to identify numerous instances in which individuals on the unreported payroll made relatively small sums and received only one or a few checks. But Deleon again fails to account for the fact that workers moved between the reported and unreported payrolls, and those who received relatively little in unreported wages may well have received more in reported wages. Absent a competent basis to conclude that any of Deleon's workers were bona fide independent contractors, we find no clear error. See Stergios, 659 F.3d at 135.

Second, Deleon takes issue with the government's method of calculating the income tax withholding losses that resulted from her misclassification of workers. She claims that the government failed to account for potential low-income workers who may not have had any tax liability.

As Agent Guidoboni testified at trial, there are three components of a payroll tax: the Social Security portion (taxed at 12.4 percent), the Medicare portion (taxed at 2.9 percent) and the federal income tax withheld, which is based upon an individual worker's designated allowances, as reported to the employer on IRS Form W-4. For the unreported payroll workers, of course, there were no W-4 forms, so Agent Guidoboni had to calculate the federal

income tax withholdings in some other way.  Agent Guidoboni derived an average rate to apply to the unreported payroll by using Methuen Staffing's own data from the reported payroll.  For each quarterly reported payroll tax return, Agent Guidoboni divided the federal income tax withholdings by the total compensation reported and derived a tax rate that he then applied to the unreported payroll.  His rates, which he described as "conservative," generally ranged from six to ten percent.[5]

Agent Guidoboni's technique strikes us as having resulted in "a reasonable estimate based on the available facts."  U.S.S.G. § 2T1.1, Application Note 1.  Furthermore, as the district court noted, the debate is largely academic, because even without the income tax losses, which comprised $423,000 of the total $1.2 million loss calculation, Deleon's offense level and sentencing range would have been the same, given how the sentencing guideline grouping principles operate with respect to the multiple offenses of conviction at issue here.  See id. § 3D1.4.

Deleon's final challenge to the loss calculation relates to the inclusion of data that she claims was unreliable.  As part of his process of determining the payroll taxes due and owing, Agent Guidoboni reviewed a spreadsheet listing approximately 13,000

---

[5] It is worth mentioning that Note A to U.S.S.G. § 2T1.1(c) prescribes a tax rate of twenty-eight percent of unreported gross income in situations in which gross income has been underreported, unless a more accurate determination of the tax loss can be made.

handwritten checks drawn on the Methuen Staffing bank account. The spreadsheet reflected the account number of each check, the check number, the check amount, the payee, the date of the check, and any remarks written on the memo line of the check. Agent Guidoboni testified that he only included in his calculations checks that had an hourly wage rate and a number of hours worked noted in the check memo line, except where he had identified another check to the same worker that included either an hourly rate or hours worked. At sentencing, Deleon identified at least thirty-three checks without notations in the memo line that she claimed Agent Guidoboni should not have included in his calculations.

The government argues, and Deleon does not contest on appeal, that twenty-nine of those were checks to payees for whom Agent Guidoboni had identified another check that did have a proper wage or hour notation on the memo line. That leaves four checks issued to entities that clearly were not employees. We agree with Deleon that it was error for the government to include those checks in its calculation, but the checks totaled $1,807 of the $4,560,965.67 unreported employee payroll calculation. Deleon has made no argument that the inclusion of that $1,807 affected her sentence, and such an insignificant error does not undermine the entire loss calculation.

The government's loss calculation may not have been perfect, but it was the kind of rough estimate with which

sentencing courts routinely deal, see Rostoff, 53 F.3d at 407, and the court here carefully deliberated before determining that it was reasonable. We find no clear error in that conclusion, particularly given that Deleon did not put forward an alternate calculation. "[A] party dissatisfied with the sentencing court's quantification of the amount of loss in a particular case must go a long way to demonstrate that the finding is clearly erroneous." Id. Deleon has not cleared that high bar.

## C. The alleged Rule 32 violation

Deleon's final claim is that we should remand her case for resentencing because the district court failed to ask, at her sentencing hearing, whether she and her attorney had read and discussed the PSR and its addenda. Because Deleon failed to challenge the district court's compliance with Federal Rule of Criminal Procedure 32 at the sentencing hearing itself, we review her claim for plain error. United States v. Espinola, 242 F. App'x 709, 711 (1st Cir. 2007), vacated on other grounds, 552 U.S. 1240 (2008); see also United States v. Jeross, 521 F.3d 562, 586 (6th Cir. 2008); United States v. Stevens, 223 F.3d 239, 242 (3d Cir. 2000); United States v. Lockhart, 58 F.3d 86, 88 (4th Cir. 1995).[6]

_____

[6] Deleon attempts to bypass the plain error standard by invoking United States v. Mitchell, 243 F.3d 953 (6th Cir. 2001), which she describes as having adopted a "bright-line policy" requiring resentencing whenever a Rule 32 violation occurs, regardless of whether the defendant objected to the error below. But while the Sixth Circuit did remand for resentencing without a showing of prejudice in Mitchell, id. at 955, it did not hold that

-12-

Rule 32(i)(1)(A) requires a sentencing court to "verify that the defendant and the defendant's attorney have read and discussed the presentence report and any addendum to the report." Fed. R. Crim. P. 32(i)(1)(A). There is no doubt "that it is the better practice for trial courts to address the defendant directly in order to establish that he or she has had the opportunity to read the [PSR] and to discuss it with his/her counsel. This simple practice will avoid unnecessary challenges and help ensure fairness in the sentencing procedure." United States v. Manrique, 959 F.2d 1155, 1157-58 (1st Cir. 1992) (quoting United States v. Mays, 798 F.2d 78, 80 (3d Cir. 1986) (internal quotation marks omitted)). But we have held that "if it is abundantly clear from the sentencing hearing that both defendant and his counsel are familiar with the report, a new sentencing hearing will not be mandated, even if the court failed to directly inquire whether the defendant had an opportunity to review the report." Id. at 1157;[7] see also

the plain error standard does not apply to a forfeited Rule 32(i)(1)(A) claim. Indeed, the Sixth Circuit has held just the opposite. See Jeross, 521 F.3d at 586. Furthermore, what occurred here would not qualify as a Rule 32 violation under Mitchell. See 243 F.3d at 955 ("The district court need not make an affirmative inquiry, so long as it can somehow determine that defendant and counsel have read and discussed the report.").

[7] Deleon is correct that Manrique addressed a prior iteration of Rule 32(i)(1)(A), which required the district court to "determine that the defendant and the defendant's counsel have had the opportunity to read and discuss the presentence investigation report." Fed. R. Crim. P. 32(a)(1)(A) (1992). The Rule was amended in 1994 and now requires the court to "verify" (as opposed to "determine") that the defendant and her attorney have not only

<u>Espinola</u>, 242 F. App'x at 711 (holding that, where it is clear from the record that defense counsel "was thoroughly familiar with the PSR, 'we will not assume that defense counsel did not discuss so critically important a document with his client, especially since appellant claims no such dereliction'" (quoting <u>United States</u> v. <u>Cruz</u>, 981 F.2d 613, 620 (1st Cir. 1992))).

      Here, it was "abundantly clear" from the record that Deleon had reviewed the PSR and its addenda with her attorney. <u>Manrique</u>, 959 F.2d at 1157. We note just a few of the salient facts. Shortly after she was appointed to replace Deleon's trial counsel, Deleon's sentencing counsel moved for a continuance of the original sentencing hearing, noting that Deleon's prior counsel had not reviewed the PSR with her and that sentencing counsel had begun to do so but needed more time to complete that process. Deleon's sentencing counsel later submitted seventy-seven objections to the PSR and filed two sealed submissions with the court. Many of those objections began with the phrase, "Ms. Deleon advises" and included information that could only have been obtained from Deleon herself. One objection, for example, provided explanations for Deleon's

---

had the <u>opportunity</u> to read and discuss the PSR but have actually "read and discussed" it. Fed. R. Crim. P. 32(i)(1)(A) (2012). We see no reason why those changes to the Rule, however, should alter <u>Manrique</u>'s holding that Rule 32 does not require an explicit, specific inquiry on the record. <u>See</u> <u>United States</u> v. <u>Esparza-Gonzalez</u>, 268 F.3d 272, 274 (5th Cir. 2001); <u>Mitchell</u>, 243 F.3d at 955; <u>Stevens</u>, 223 F.3d at 241. <u>But</u> <u>see</u> <u>United States</u> v. <u>Rone</u>, 743 F.2d 1169, 1174 (7th Cir. 1984).

decision to flee the country before her sentencing hearing. Others offered details to amend or correct the "Personal and Family Data" section of the PSR, including the correct spelling of Deleon's grandfather's name, Deleon's height and weight, the fact that a family parakeet had died while she was incarcerated, and information about her medical history.

Given the myriad indicators that Deleon reviewed the PSR with her sentencing counsel, and the fact that she has not made any claim to the contrary on appeal, we find no plain error and no need for a new sentencing hearing. See Manrique, 959 F.2d at 1157; Espinola, 242 F. App'x at 711.

### III. Conclusion

For the foregoing reasons, we affirm.

-15-