# United States Court of Appeals
## For the First Circuit

No. 21-1477

UNITED STATES OF AMERICA,

Appellee,

v.

JEFFREY S. WINDLE,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. George A. O'Toole, Jr., U.S. District Judge]

Before

Lynch, Thompson, and Gelpí,
Circuit Judges.

Zainabu Rumala, Assistant Federal Public Defender, on brief
for appellant.
Rachael S. Rollins, United States Attorney, and Randall E.
Kromm, Assistant United States Attorney, on brief for appellee.

May 26, 2022

**LYNCH**, **Circuit Judge**.  Within months of being released from a fifteen-year prison sentence for convictions of mail and wire fraud, money laundering, and tax evasion, Jeffrey S. Windle once again engaged in fraud, in violation of the terms of his supervised release.  After Windle stipulated to the violations, the district court added to the terms of his supervised release a monitoring condition as to his computer activities to provide Windle with needed incentives for him to comply with the law. Windle argues on appeal, first, that this condition is unwarranted, and second, that it is vague and overbroad.  Only the first objection was preserved.

The imposition of the computer monitoring condition was not an abuse of discretion, as it was more than warranted by Windle's long and extensive history of fraudulent use of computers to obtain over $14 million from his victims and Windle's prompt recidivism upon his release from imprisonment.  Further, the unpreserved arguments fail on plain error review, as there was no error at all.  We affirm.

I.

A. Procedural History

Windle pleaded guilty in March 2009 to a twenty-four-count superseding indictment charging him with mail and wire fraud, money laundering, and tax evasion.  He was sentenced on June 23, 2009 to fifteen years of imprisonment, followed by three years of

supervised release. He also was ordered to pay more than $14.5 million in restitution.

Windle was released from prison and began his first term of supervised release in March 2020. Probation discovered by October 2020 that Windle had violated conditions of his release, and identified further violations in February 2021. Windle stipulated to the violations at a revocation hearing held on May 5, 2021. The district court revoked Windle's supervised release. The court sentenced Windle to a "12 month[] period [of imprisonment], so that it will be a full 12 months, followed by two years of supervised release."

The district court reimposed the previous conditions of supervision and also imposed several new conditions. One of the new conditions is the subject of this appeal and states:

> The defendant shall allow the US Probation Office to install software designed to monitor computer activities on any computer and smartphone the defendant is authorized to use. This may include, but is not limited to, software that may record any and all activity on the computers the defendant may use, including the capture of keystrokes, application information, internet use history, email correspondence, and chat conversations.

Defense counsel did not object contemporaneously to the scope of the computer monitoring condition, but did question whether the condition was "appropriate" and "reasonably related to Mr. Windle's conviction here," positing that the violations involved

- 3 -

"more face-to-face transactions than the use of a computer."  The district judge responded:  "No.  I think the fraud aspects justify it."  We next describe this fraud.

B. Factual History

As the district court observed at Windle's first sentencing hearing in 2009, Windle has "a history of . . . stealing by fraud[,] deception, [and] misuse."  This history began as early as 1990, when Windle was first convicted as an adult of attempted larceny for trying to defraud a store clerk.  Since then, he has been convicted of mail fraud, wire fraud, tax evasion, money laundering, larceny, fraudulent use of a credit card, utter fraud, forgery, and false claims.

Relevant here, between 2003 and 2008, Windle defrauded his former employer, Cambium Learning, Inc. ("Cambium"), of nearly $14 million and the Congregational Church of South Dennis ("CCSD")[1] of close to $650,000.  After serving more than a decade in prison and while on supervised release in 2020, he again engaged in fraud in an attempt to obtain a Range Rover and multi-million-dollar properties.  As next described, he frequently used computers to execute this fraudulent activity.

---

[1]     CCSD is also commonly referred to as the South Dennis Congregational Church, or "SDCC."

## 1. Fraud on Cambium

In 2004, Windle was hired to be the Director of Budget and Finance at Cambium, a company that provides instructional materials, services, and technology to educators working with struggling students. Windle was responsible for overseeing various financial functions at Cambium, including the preparation of consolidated financial statements, maintenance of financial reporting records, closing of the company's books, payment of company expenses, initiation of wire transfers, and writing and signing of company checks.

Windle's fraud involved the purchase of two pieces of real estate, one in Massachusetts and one in Florida. In the first year he was hired, Windle wrote himself two checks totaling more than $1.9 million from Cambium's checking and money market accounts. He used the money to purchase the house in Massachusetts, which his family moved into in 2005. Windle again wrote a check from Cambium's checking account in 2006, that time in the amount of approximately $1.16 million. After falsely representing to the company's Chief Financial Officer that the check was for a transfer of funds between Cambium accounts, Windle used the money to purchase a bank check for a vacation home in Florida.

Around the same period, Windle began using his email to direct Cambium's accounts payable staff to issue checks that Windle

ultimately used for his own personal benefit. He first sent emails asking for checks in amounts totaling close to $180,000, all made payable to "Jeffrey S. Windle." Windle falsely represented to the staff that such payments were reimbursements for business expenses he incurred. The staff issued Windle the checks, which he deposited into his personal checking account and used to pay for home renovations and to purchase cars and boats.

Windle also directed via email the accounts payable staff to issue checks made payable to CCSD for "consulting fees" pursuant to Cambium's "contract" with CCSD. Cambium had no contract with CCSD. Cambium's accounts payable staff issued thirty checks in accordance with Windle's email instructions, for a total of approximately $275,000. Windle deposited the checks into CCSD's bank account and then transferred the funds into his personal account for his and his family's personal use.

Between March 2006 and April 2008, Windle also manually wrote numerous checks from Cambium's Bank of America checking account made payable to "SDCC" and "CCSD," and then emailed Cambium's accounts payable to conceal his diversion. His emails instructed the accounts payable staff to record the checks in Cambium's books as inventory purchases. There had been no such inventory purchases. Windle deposited these unauthorized checks, which totaled approximately $4.8 million, into CCSD's account before transferring the funds into his personal account. He set

up a phony post office box address in the name of Bank of America and fraudulently filled out bank confirmation forms to deceive auditors as to the true balance of Cambium's bank account.

From June 2007 through April 2008, Windle used his authority to pay Cambium's vendors from a company account in Colorado (the "Sopris West" account) to direct numerous wire transfers so that he could purchase real estate, a yacht and other boats, a Mercedes, a golf club membership, and a landscaping service. Windle further used email to ask the Operations Manager at the company's bank for an address change for the Sopris West account so that the account's bank statements would be mailed to Windle (rather than to Cambium's senior staff accountant). Windle then prepared false spreadsheets for Cambium that purported to reflect the Sopris West account's banking transactions and account balances to prevent discovery of the low balance in the account. Windle obtained a total of approximately $5 million from these wire transfers.

## 2. Fraud on the Church

Windle also defrauded his church. Windle and his family were parishioners at CCSD, and he became the volunteer treasurer of the church in 2003. As the treasurer, Windle oversaw and had signature authority over several of CCSD's bank accounts. Instead of closing certain of those accounts as directed, Windle kept them

open and used them to launder the money he stole from Cambium and the church.

Between 2003 and 2005, Windle wrote himself and his wife collectively seven checks from CCSD's accounts for a total of approximately $278,250. He stole an additional approximately $434,000 from the church between December 2003 and January 2008 by withdrawing cash or writing checks to himself or to third parties.

Windle took steps to conceal his fraud by fabricating monthly financial statements and annual reports. He submitted balance sheets that significantly overstated the amount of funds in the church's accounts. Windle also created phony audit report letters by fabricating the letterhead of an established Certified Public Accountant ("CPA") firm. He did this to convince CCSD's Board of Directors that the church's finances had been audited by independent CPAs, although they had not.

Windle's schemes were uncovered in 2008. Law enforcement discovered that Windle had failed to report his fraud proceeds on his federal tax returns for the taxable years 2004 through 2007, and that he had prepared a fraudulent federal income tax return (Form 1040) for each year, which he filed electronically.[2]

_____

[2] Windle was convicted in 1997 of false claims, having electronically filed false U.S. Income Tax Returns (Forms 1040) for the 1993 and 1994 tax years based on fabricated W-2 Forms.

- 8 -

Windle served more than a decade in prison for these offenses. Within one year of his release in March 2020, Windle engaged in the following fraudulent conduct:

### 3. Violations of Supervised Release

On October 13, 2020, Windle was arrested by Barnstable Police Officers and charged with larceny over $1,200 by false pretenses. In September 2020, Windle had agreed to make a wire transfer to a car dealership in the amount of approximately $118,000 for the purchase of a Range Rover, although he did not have sufficient funds to do so. The transfer failed, and Windle agreed to bring a personal check in its place. Based on this promise, the car dealership permitted Windle's girlfriend to take possession of the vehicle. Windle provided the dealership with a personal check that same day, but the check did not clear. Windle had placed a stop payment on the check. When the dealership tried contacting Windle about the issue, Windle avoided the calls, so the dealership contacted the police.

The Probation Office questioned Windle about the incident. He admitted he did not have the funds to cover the expense and did not explain his conduct.

Around the same time, Windle lied to the Probation Office, saying that he did not sign (electronically) a Purchase and Sale agreement for the purchase of a $4 million home as "Jeffrey Whitney." As the Probation Office inquired about the

purchase, it also discovered that Windle had failed to disclose, as he was required to, all of his financial accounts. Windle previously had told the Probation Office that his only financial account was a checking account with Martha's Vineyard Bank. Meanwhile, Windle had provided the real estate broker with a bank statement in the name of Jeffrey Whitney from a retirement savings account as proof of funds for the real estate transaction. The account reflected a balance of more than $7 million. Upon further inquiry from the Probation Office, Windle admitted he had a different retirement account in his own name and provided a screenshot via text message as proof of the account. That account had a balance of approximately $350,000.

Windle thereafter was summoned and appeared before a magistrate judge on December 4, 2020 for an initial appearance on revocation proceedings. He was released pending the final revocation hearing with an additional condition that he must use his true name, which he promptly violated. Within one month, Windle was caught trying to buy a $15 million home, presenting himself as Jeffrey Leonard with a deposit check that never cleared.

In sum, for the underlying conviction, the record shows that Windle used email to defraud Cambium and his church of millions of dollars. The record further shows that he also used his computer to conceal his schemes by creating fraudulent spreadsheets, financial statements, annual reports, and audit

letters and letterhead. As for the violation of his supervised release, Windle used a computer to electronically sign the fraudulent Purchase and Sale agreement and to access a retirement account he was hiding from the Probation Office.

## II.

We review preserved objections to the imposition of a special condition of release for abuse of discretion and unpreserved objections for plain error. United States v. McCullock, 991 F.3d 313, 317 (1st Cir. 2021). "[W]e will find an abuse of discretion only when left with a definite conviction that 'no reasonable person could agree with the judge's decision.'" Id. (quoting United States v. Cruz-Ramos, 987 F.3d 27, 41 (1st Cir. 2021)). This court will find plain error only if the defendant shows "there [was] (1) an error (2) that is plain, and that the error (3) affects substantial rights and (4) seriously impairs the fairness, integrity, or public reputation of judicial proceedings." United States v. Perazza-Mercado, 553 F.3d 65, 74–75 (1st Cir. 2009) (quoting United States v. Prochner, 417 F.3d 54, 59 (1st Cir. 2005)).

In assessing the validity of a special condition,

> we apply 18 U.S.C. § 3583(d) and U.S.S.G. § 5D1.3(b), which require that special conditions cause "no greater deprivation of liberty than is reasonably necessary" to achieve the goals of supervised release, 18 U.S.C. § 3583(d)(2), and that the conditions be "reasonably related" both to these goals

- 11 -

and to the "nature and circumstances of the offense and the history and characteristics of the defendant[,]" 18 U.S.C. § 3583(d)(1); see also 18 U.S.C. § 3553(a)(1).

Id. at 69. The goals of supervised release include "deterr[ing] . . . criminal conduct," and "protect[ing] the public from further crimes of the defendant." 18 U.S.C. §§ 3553(a)(2)(B)-(C), 3583(d)(2).

This court has upheld broad restrictions on internet access as a condition of supervised release "where (1) the defendant used the internet in the underlying offense; (2) the defendant had a history of improperly using the internet to engage in illegal conduct; or (3) particular and identifiable characteristics of the defendant suggested that such a restriction was warranted." United States v. Aquino-Florenciani, 894 F.3d 4, 7 (1st Cir. 2018) (emphasis added) (quoting United States v. Hinkel, 837 F.3d 111, 126 (1st Cir. 2016)).

As the recitation of facts demonstrates, the computer monitoring condition was warranted. It is reasonably related to the goals of supervised release, Windle's long history of fraud, and his high risk of reoffending.

"This is not the case of a defendant who 'has no history of impermissible internet use' and for whom 'the internet was not an instrumentality of the offense conviction.'" See United States v. Vélez-Luciano, 814 F.3d 553, 560 (1st Cir. 2016) (quoting

Perazza-Mercado, 553 F.3d at 69); see also United States v. Browder, 866 F.3d 504, 512 (2d Cir. 2017) (upholding computer monitoring condition due to defendant's illicit computer usage); United States v. Dolivek, 510 F. App'x 573, 574 (9th Cir. 2013) (unpublished) (same). Windle's thirty-year criminal history and habitual engagement in fraud using his computer, email, and the internet, make the condition reasonable. He had been undeterred by his twelve years in prison and his initial terms of supervised release. The district court reasonably concluded that additional conditions and incentives for him to comply with the law were needed.

Windle's argument as to the fact that no computer or smartphone monitoring condition had been imposed during his initial supervision works against him. Indeed, Windle rapidly returned to fraudulent activities during this initial supervision in the absence of such a condition, showing the original conditions were insufficient. This clearly supports the special condition at issue here. United States v. Stergios, 659 F.3d 127, 134 (1st Cir. 2011) ("It was . . . reasonable for the district court to find, the second time around, that restrictions on [defendant's] internet usage were necessary to deter him from committing further crimes."). Windle's "status as a repeat offender suggested that an internet restriction was warranted." Id. at 135.

Windle's arguments that the condition on computer device usage is overbroad and vague fail at step one of plain error review. Windle focuses primarily on his overbreadth argument, contending that the monitoring condition is overly intrusive, even though his supervision is for only two years and the challenged condition is not a complete or partial ban on Windle's computer or internet usage. Cf. United States v. Ramos, 763 F.3d 45, 63 (1st Cir. 2014) ("[As compared to broader internet bans,] monitoring and filtering systems, searches of any computer equipment, and searches of other electronic or data-storage devices upon reasonable suspicion . . . are narrowly tailored tools."); Perazza-Mercado, 553 F.3d at 73 ("[O]ur concern regarding a categorical residential internet ban does not imply that [defendant] is entitled to unlimited internet access, particularly if a 'relatively narrowly-tailored condition' would 'readily accomplish[] the goal of restricting use of the Internet and more delicately balance[] the protection of the public with the goals of sentencing." (third and fourth alterations in original) (quoting United States v. Zinn, 321 F.3d 1084, 1093 (11th Cir. 2003))).

Windle next argues that the district court should have further narrowed the computer condition, such that the Probation Office be required to have reasonable suspicion of further criminal conduct or further violation of a condition of supervised release

before it can monitor Windle's computer usage.  He cites to and misreads <u>Stergios</u>, 659 F.3d at 134.  Such a limitation is not necessary here.  First, this court previously has endorsed the imposition of computer monitoring and filtering systems, when compared to broader internet and computer bans, as "narrowly tailored tools" for deterring a defendant from using a computer to commit further crimes.  <u>See</u> <u>Ramos</u>, 763 F.3d at 63.  Second, Windle has already violated the conditions of his supervised release once.

For the reasons stated above, we reject Windle's argument and <u>affirm</u>.