# United States Court of Appeals
## For the First Circuit

No. 06-2400

UNITED STATES OF AMERICA,

Appellee,

v.

ALBERT V. INNARELLI,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Michael A. Ponsor, U.S. District Judge]

Before

Torruella, Lynch, and Lipez,
Circuit Judges.

Elizabeth Caddick, for appellant.
Mark T. Quinlivan, Assistant United States Attorney, with whom
Michael J. Sullivan, United States Attorney, was on brief for
appellee.

April 29, 2008

**TORRUELLA**, **Circuit Judge**. Albert Innarelli pled guilty to and was convicted of sixty-seven counts of wire fraud and one count of conspiracy to launder money for his role in a "land-flipping" scheme in Springfield, Massachusetts. The district court imposed a within-the-Guidelines sentence of seventy-two months' imprisonment, after determining that Innarelli had intended to defraud his victims out of between $2.5 million and $7 million; the court also ordered Innarelli to pay restitution to some of the banks and individuals he defrauded. On appeal, Innarelli argues that the district court erred in calculating the amount of intended loss for purposes of his sentence, and that it failed to adequately take into account several personal circumstances he claims justified a lower sentence; he also alleges error in the restitution order. The Government concedes that the loss calculation in the restitution order was erroneous. After thorough review of the parties' arguments and the record, we affirm Innarelli's sentence, but vacate the restitution order and remand with instructions that it be recalculated by the district court.

## I. Background

As Innarelli was sentenced following a guilty plea, "'[w]e distill the facts from the plea colloquy, the undisputed portions of the presentence investigation report . . . and the transcript of the disposition hearing.'" United States v.

Martínez-Bermúdez, 387 F.3d 98, 99 (1st Cir. 2004) (quoting United States v. Brewster, 127 F.3d 22, 24 (1st Cir. 1997)).

Between 1999 and 2001, Innarelli and twelve coconspirators devised and perpetrated an elaborate land-flipping scheme in the Springfield area. The scheme was effected through the coordinated activities of four separate groups of coconspirators. The first group -- the "land-flippers" -- purchased low-value, distressed properties, usually at auction. Many of these properties needed repairs or had housing-code violations, and some were condemned. This group then sold the properties at greatly inflated prices to unwitting and typically unsophisticated buyers, most of whom had low income, bad credit, or both. In order to obtain financing for the buyers, a second group of coconspirators consisting of mortgage brokers generated documents falsely representing to lending institutions that the buyers had the financial wherewithal to afford mortgage loans. A third group consisting of property appraisers falsely inflated their appraisals of the properties, in order to give the lenders the impression that the properties were worth as much as they were being sold for. Innarelli, the sole lawyer in the scheme, made up the final component of the conspiracy: he prepared and signed off on closing documents which contained false information, and prepared false titles to show that the land-flippers had held title

to the properties for longer than they actually had.[1]  In fact, the time between the land-flippers' initial purchase of the property and the sale to the victim-buyer was usually remarkably short, sometimes as short as one week.  Innarelli also had the lenders wire the proceeds of the fraud to his Interest on Lawyers' Trust account ("IOLTA") and wrote checks to some of the coconspirators from this account to compensate them for their participation.

Many of the buyers were predictably unable to pay their mortgage loans and defaulted.  When the lenders foreclosed, some were unable to recoup the full value of their loans because the property turned out to be worth much less than had originally been represented.  The scheme was eventually discovered and its participants, including Innarelli, were indicted.  Innarelli was charged with sixty-eight counts of wire fraud, in violation of 18 U.S.C. § 1343, relating to the funds wired into his IOLTA account by the lenders.  He was also charged with one count of conspiracy to launder the proceeds of the scheme, in violation of 18 U.S.C. §§ 1956(h) and 1957.

On April 24, 2006, Innarelli pled guilty to the conspiracy count and all but one of the wire-fraud counts.[2]  The

---

[1]  This was apparently done to get around the lenders' "seasoning" requirement, by which the lender would not lend money for a property that had been held by the seller for under a year.

[2]  At the Government's request, the district court allowed one of the wire-fraud counts to be withdrawn.

district court sentenced Innarelli in a hearing on September 20, 2006. The court assigned to Innarelli a criminal history category ("CHC") of I and an offense level of 26. This offense level consisted of several components, one of which is at issue on appeal: an eighteen-level increase resulting from the district court's determination that Innarelli intended to cause the victims to suffer a loss of between $2.5 million and $7 million. See U.S.S.G. § 2B1.1(b)(1)(J) (2006). CHC I and an offense level of twenty-six produced a Guidelines Sentencing Range ("GSR") of sixty-three to seventy-eight months. The district court rejected Innarelli's argument that he deserved a below-Guidelines variance due to several unique personal circumstances -- such as past drug addiction and two young children -- and sentenced him in the middle of the range to seventy-two months' imprisonment.

The district court also ordered Innarelli to pay restitution to certain of the victims. See 18 U.S.C. § 3663A (2000) (restitution mandatory where defendant has committed an offense against property with fraud or deceit). The court determined that Innarelli owed restitution to lender Equicredit (now Bank of America) in the amount of $1,206,858; to lender National City in the amount of $17,000;[3] and to seven victim-buyers in the amount of $10,000 each. We examine the district court's

---

[3]   There were several other victim-lenders, but the restitution order only applied to Equicredit and National City.

reasoning in support of these figures in the relevant section below.

## II.  Discussion

Innarelli raises three grounds of appeal.  First, he challenges the loss calculation that went into his Guidelines base offense level.  Second, he attacks his sentence as unreasonable, because it overstates his culpability by failing to take into account what he regards as unique personal circumstances.  Third, he challenges the order of restitution, including the court's calculation of the various amounts owed.  We address each of these challenges in turn.

### A.  The Amount of Loss in the Guidelines Offense Level

We review the district court's interpretation and application of the Guidelines de novo; we review related findings of fact, including the court's calculation of amount of loss, for clear error.  See United States v. McCoy, 508 F.3d 74, 78 (1st Cir. 2007); United States v. Flores-Seda, 423 F.3d 17, 20 (1st Cir. 2005).  In fraud cases such as this one, a defendant's Guidelines offense level begins with a base level of six.  U.S.S.G. § 2B1.1 (a)(2).  Levels may be added depending on the amount of loss the victim suffered as a result of the defendant's crime; an amount of loss greater than $2.5 million but less than $7 million yields eighteen levels on top of the original six.  See id. § 2B1.1(b) (1)(J).

The Guidelines commentary instructs that loss in this instance should be the greater of "actual loss" or "intended loss." Id. § 2B1.1 cmt. n.3(A). We recently clarified that "intended loss" in these circumstances is a term of art meaning the loss the defendant reasonably expected to occur at the time he perpetrated the fraud. See McCoy, 508 F.3d at 79 (also remarking that "expected loss" would have been a better term in the Guidelines commentary than "intended loss"). In other words, for purposes of determining a defendant's sentence (but, importantly, not the amount of restitution he may be required to pay),[4] the Guidelines anticipate that the defendant will be punished commensurate with the degree of loss he reasonably expected to occur as long as this amount is greater than the victims' actual loss -- including where the victims actually incurred no loss at all. See id.

At sentencing, the district court first determined the total amount of the loan issued for each of the flipped properties, and subtracted from that number the considerably lower amount the land-flippers paid for the piece of property in question. This latter quantity served as a proxy for the true amount of the security the lender held on the property. After performing this calculation for each of the more than 100 flipped properties, the

_____

[4] As discussed below, for purposes of determining the restitution portion of a defendant's punishment, only actual loss may be taken into account. See United States v. Swanson, 394 F.3d 520, 527 (7th Cir. 2005).

-7-

district court added the results together to arrive at a total amount of intended loss in excess of $2.5 million; the court did not pinpoint an exact amount of loss.

We recently sanctioned this methodology in McCoy -- another case involving land-flipping in the Springfield area -- as consistent with the Guidelines commentary's instruction that "[t]he court need only make a reasonable estimate of the loss." U.S.S.G. § 2B1.1 cmt. n.3(C) (emphasis added). We explained as follows:

> As McCoy was obtaining loans for individuals with low income and poor credit, he could -- and should -- have expected that the banks would probably recover only the value of the mortgaged properties. Intended loss was therefore the value of the loans less the expected value of the properties.
>
> The district judge determined that the expected value of the properties at the time of the frauds was the price paid for the properties. The land-flipping in this case tended to occur rapidly, with homes being sold to new purchasers just weeks or even days after being purchased for use in the frauds. Thus, the purchase price paid by those engaged in the scheme was a reasonable proxy of the value of the collateral at the time the frauds occurred. . . .

McCoy, 508 F.3d at 79. Given that the underlying facts in this case are virtually identical to those in McCoy,[5] we see no reason to depart from our conclusion there: the district court's loss estimate was well within the bounds of what is reasonable.

---

[5] The Government stated at oral argument that "McCoy involved the very same mortgage-fraud scheme that was at issue here."

-8-

Despite McCoy, Innarelli argues that he should not be held responsible for the entire difference between the land-flippers' purchase price and the sale price with respect to each and every piece of property, for two reasons. First, he claims he never intended the buyers to default on their mortgages and he never intended the lenders to foreclose; as a real-estate lawyer, his reputation and continued good business depended on the success of the property transactions he helped to effect. Second, some of the buyers were able to continue making payments and did not default on their loans. Even when buyers defaulted, moreover, many of the properties in fact appreciated in value after the frauds and before the lender resold them after foreclosure, and so many of the lenders suffered no actual loss as a result of the scheme. In fact, some even turned considerable profits.

Both these arguments must fail in light of what we have said above. Notwithstanding the Guidelines commentary's use of the word "intended," we focus our loss inquiry for purposes of determining a defendant's offense level on the objectively reasonable expectation of a person in his position at the time he perpetrated the fraud, not on his subjective intentions or hopes. See id.[6] Moreover, as already noted, it is immaterial that many of

---

[6] While McCoy suggests in passing that a subjective component may play some role in the intended-loss inquiry, McCoy, 508 F.3d at 79 (noting that intended loss might be zero "if the defendant sincerely intended and reasonably expected fully to repay the loan" (emphasis added)), it is clear that under these facts the objective

the victims actually incurred no loss.  See id.  As the district court aptly stated, "[l]oss in a fraud case is a yardstick for moral culpability."  Accord id. (intended loss is a "measure for the defendant's culpability").  Where, as here, the defendant reasonably should have expected that loss would result, he can and generally should be punished more severely to account for his greater level of moral culpability, even where the victim has managed to make money in spite of the fraud.

Finding no error in the district court's calculation of Innarelli's Guidelines offense level, we move on to Innarelli's next sentencing-related challenge.

**B.  The Reasonableness of the Sentence**

We review sentences for reasonableness, a task composed of both procedural and substantive inquiries.  United States v. Politano, No. 06-2342, 2008 WL 880523, at *2 (1st Cir. Apr. 2, 2008) (citing United States v. Gall, 128 S. Ct. 586, 597 (2007)). We first review the procedural component of the sentence for abuse of discretion; procedural errors amounting to an abuse of discretion might include "'failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the 18 U.S.C. § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence -- including an

component is dispositive, as it was in McCoy.

-10-

explanation for any deviation from the Guidelines range.'" Id. (quoting Gall, 128 S. Ct. at 597) (alterations omitted). If this review reveals no abuse of discretion, we then examine the substantive reasonableness of the sentence in the totality of the circumstances, again for abuse of discretion. United States v. Martin, No. 06-1983, 2008 WL 748104, at *5 (1st Cir. Mar. 21, 2008) (citing Gall, 128 S. Ct. at 597). The district court's discretion in determining a defendant's sentence is very broad: once the GSR is properly calculated, "sentencing becomes a judgment call" for the court, and the court may construct a sentence varying from the GSR "based on a complex of factors whose interplay and precise weight cannot even be precisely described." Id. at *4 (internal quotation marks omitted). We generally respect the district court's sentence as long as the court has provided a plausible explanation, and the overall result is defensible. United States v. Dixon, 449 F.3d 194, 204 (1st Cir. 2006).

Beyond his challenge to the eighteen-level increase in his offense level rejected above, Innarelli does not quarrel with the district court's calculation of the applicable GSR. Instead, he claims his sentence is unreasonable because the district court failed to take sufficient account of certain personal characteristics that, in his view, warrant a variance below the GSR. See 18 U.S.C. § 3553(a)(1) ("The court . . . shall consider . . . the history and characteristics of the defendant.").

-11-

Specifically, he was impaired with a cocaine addiction at the time he committed his crimes, and subsequently underwent three years of successful rehabilitative treatment; he has since remained a sober and productive member of society. Innarelli also has two young children, and provides a great deal of their care in conjunction with his ex-wife. Innarelli asserts that his incarceration would have a devastating effect on his children.

Innarelli made these same arguments to the district court, and the court considered each of them in great detail through the lens of § 3553(a). We find the court's examination of Innarelli's personal characteristics, and the explanation of its reasons for not varying his sentence downward, to be clear, thoughtful, and eminently plausible. Contrary to Innarelli's suggestion, we see no indication anywhere in the record that the court overvalued the Guidelines or undervalued the § 3553(a) factors. The sentence imposed on Innarelli -- squarely in the middle of the GSR -- was more than defensible considering the gravity of his crimes and their detrimental effect on many lending institutions and ordinary citizens, not to mention on the trust of those and other members of the community in the honesty and integrity of their lawyers. As such, Innarelli has not carried the heavy burden of proving that his within-the-range sentence was unreasonable or an abuse of discretion. See United States v. Pelletier, 469 F.3d 194, 204 (1st Cir. 2006).

Seeing no reason to disturb Innarelli's sentence, we turn to Innarelli's third and final assignment of error.

### C.  The Restitution Order

The Mandatory Victims Restitution Act ("MVRA") compels a sentencing court to order a defendant convicted of certain crimes, including crimes against property, to make restitution to his victim.  See 18 U.S.C. § 3663A(a), (c).  The defendant must return the property to the victim or, if such return is impossible, impracticable, or inadequate, must pay the victim the value of the property on the date of its loss or on the date of sentencing, whichever is greater, minus the value of any part of the property that is returned.  Id. § 3663A(b).  The Government bears the burden of demonstrating the loss amount by a preponderance of the evidence.  Id. § 3664(e).  Ordinarily, we review an order of restitution for abuse of discretion, and findings of fact subsidiary to the order for clear error.  United States v. Mahone, 453 F.3d 68, 73 (1st Cir. 2006).  Legal conclusions associated with restitution orders are reviewed de novo.  United States v. Cheal, 389 F.3d 35, 48 (1st Cir. 2004).

Two of the victim-lenders -- Equicredit and National City -- and seven of the victim-buyers submitted impact statements to the district court describing the losses they suffered as a result of Innarelli's crimes.  The court reviewed these statements, and ordered at sentencing that Innarelli pay restitution to these two

lenders and seven buyers.  Equicredit submitted a calculation of the amount it claims to have lost: $1,206,858.  The district court ordered Innarelli to pay this amount to Equicredit.  It then remarked, with respect to the other victims' estimates, "they're a little bit less specific, but, I think, appropriately address the crime committed against them [and] the loss that they suffered." The court accordingly directed Innarelli to pay $17,000 to National City and $10,000 to each of the seven buyers.

Innarelli claims error in these quantities.  As concerns Equicredit and National City, he argues that both lenders, through the resale of the properties after foreclosure, ultimately recovered a considerable amount of the losses they originally incurred, as many of the properties had appreciated in value between the time they were sold to the victim-buyers and the time they were resold after foreclosure.  According to a defense expert's calculations as set forth in an affidavit in the record, Equicredit recovered $755,962 and National City recovered $47,551 -- more than $30,000 above the $17,000 ordered for National City in restitution.  Innarelli argues that, under the MVRA, these recoveries must be credited against the amount of loss attributed to him.  He also complains that the district court improperly took into account the victim-buyers' emotional damage in its award of $10,000 to each of them.  For its part, the Government concedes that remand is necessary for a recalculation of all these

-14-

quantities -- or at least a clarification of how the district court arrived at the figures it did -- since the court appears to have based some or all of the awards on intended loss rather than actual loss, and to have taken into account emotional damages with respect to the victim-buyers.

We deal first with the restitution awards to Equicredit and National City. As the parties suggest, the appropriate loss amount for purposes of restitution may well be lower than the loss amount for purposes of sentencing. Unlike the calculation of loss amount in sentencing, the purpose of restitution is not to punish the defendant, but to make the victim whole again by restoring to it the value of the losses it suffered as a result of the defendant's crime. See United States v. Cornier-Ortiz, 361 F.3d 29, 42 (1st Cir. 2004);[7] accord United States v. Swanson, 394 F.3d 520, 527 (7th Cir. 2005). This is necessarily a backward-looking inquiry that takes into account what actually happened, including whether the victim managed to recover some or all of the value it originally lost. See 18 U.S.C. § 3663A(b)(1)(B); Cornier-Ortiz,

---

[7] See also United States v. Corey, 77 F. App'x 7, 11-12 (1st Cir. 2003) (discussing some of the components that may be counted as part of the victim's losses); United States v. Cutter, 313 F.3d 1, 7-8 (1st Cir. 2002) (discussing the requirement of an adequate causal link between the defendant's crime and the victim's losses).

We note that, unlike forfeiture, the purpose of restitution is not to disgorge from the defendant the property he gained at the victim's expense. See United States v. Genova, 333 F.3d 750, 761 (7th Cir. 2003). Forfeiture is not an issue in this appeal.

361 F.3d at 42 (victim cannot receive windfall from restitution award); cf. United States v. Oladimeji, 463 F.3d 152, 160 (2d Cir. 2006) (noting that, had lender that was induced into making home-equity loan by defendant's fraudulent documentation recouped money from resale of home after foreclosure, defendant would have been entitled to an offset in that amount under 18 U.S.C. § 3663A(b)(1)(B)).

The material available to us in the record is insufficiently detailed to allow us to determine whether the amounts awarded to Equicredit and National City were calculated correctly. Equicredit claimed $1,206,858, and the district court stated that it had "just given Equicredit the gross amount of the loss as they calculated." The court did not explain how it arrived at the $17,000 figure for National City. In response to Innarelli's argument at sentencing that these lenders had actually recouped the money they lost, the court stated: "I don't buy the argument that you can look down the road and say that they made money off this. They could have made a great deal more money. . . . [I]nstead of making a million, . . . they could have made 2.2 million. They lost this money. I'm comfortable with the restitution order." This passage suggests that the district court may have impermissibly taken into account intended loss in calculating the awards for Equicredit and National City, and that it did not offset the amount recovered through the resale of the properties after

-16-

foreclosure, as required by statute.  To the extent this is true, the court erred.

We now turn to the parties' assertion that the district court also erred in the restitution awards of $10,000 to each of the seven victim-buyers.  The district court stated:  "The $10,000 is a rough approximation in an effort to quantify both the financial and the emotional impact that the conspiracy had upon them."  This statement reveals two possible errors.  First, while "absolute precision" in calculating a restitution award is not required, United States v. Burdi, 414 F.3d 216, 221 (1st Cir. 2005), and the court may resolve uncertainties "with a view towards achieving fairness to the victim," it must still make a "reasonable determination of appropriate restitution," United States v. Vaknin, 112 F.3d 579, 587 (1st Cir. 1997) (quoting S. Rep. No. 532, at 31-32 (1982), reprinted in 1982 U.S.C.C.A.N. 2515, 2536-37) (internal quotation marks omitted).  We are concerned that the district court's "rough approximation" here may not have been sufficiently reflective of the losses the buyers actually incurred.  See id. ("[A]n award cannot be woven solely from the gossamer strands of speculation and surmise.").

Second, the parties are correct in pointing out that the district court may not take into account the emotional impact of the conspiracy on the victim-buyers in calculating an MVRA restitution award.  It bears repeating that restitution under the

MVRA is intended to compensate the victim for losses actually suffered as a result of the defendant's crime. Cornier-Ortiz, 361 F.3d at 42; accord United States v. Estate of Parsons, 367 F.3d 409, 442 (5th Cir. 2004) (en banc) (Dennis, J., concurring in part) ("[T]he court cannot order restitution for compensatory damages related to pain, suffering, mental or emotional distress or for punitive damages."). Even in cases where the victim suffers bodily injury, an MVRA restitution award may only include expenses relating to certain items specifically listed in the statute, such as medical expenses, lost income, and funeral expenses. See 18 U.S.C. § 3663A(b). For these reasons, to the extent the district court based a portion of each victim-buyer's restitution award on the emotional impact of the crime perpetrated against him or her, it erred.

The errors or possible errors in the restitution calculus require us to remand this case to the district court to perform a recalculation in light of the following three directives: (1) the amount of restitution ordered must be based on actual loss, not intended or expected loss; (2) the amount lost as a result of Innarelli's crimes must be offset by any amount recouped by the victim in question, including through resale of the property; and (3) no part of the order may be based on the emotional impact of the crime on the victim. The district court should clearly set

forth its reasoning and the calculations leading to the amounts ordered, if any.[8]

### III.  Conclusion

Innarelli's sentence is **affirmed**.  The order of restitution is **vacated** and **remanded** for recalculation in a manner consistent with this opinion.

**It is so ordered**.

---

[8]  In its brief, the Government reserves the right to argue before the district court that Innarelli should be subject to a higher fine.  We see nothing that would impede it from so arguing.  See United States v. Stern, 13 F.3d 489, 498 (1st Cir. 1994).