# United States Court of Appeals
## For the First Circuit

No. 13-2497

UNITED STATES OF AMERICA,

Appellee,

v.

BLESSING SYDNEY IWUALA,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Richard G. Stearns, U.S. District Judge]

Before

Howard, Selya and Kayatta,
Circuit Judges.

W. Daniel Deane, with whom Brian D. Duffy and Nixon Peabody LLP were on brief, for appellant.
Mark T. Quinlivan, Assistant United States Attorney, with whom Carmen M. Ortiz, United States Attorney, was on brief, for appellee.

June 10, 2015

**SELYA, Circuit Judge.** This case is a poster child for the adage that easy money often leads to hard lessons. For several months, defendant-appellant Blessing Sydney Iwuala was awash in a flood of easy money as a Medicare-approved provider of durable medical equipment (DME). But when the easy money dried up, he found himself facing criminal prosecution on multiple charges of health-care fraud. The trial did not go well for the defendant, and he now challenges both his conviction and his sentence. After careful consideration of his asseverational array, we affirm.

## I. BACKGROUND

In 2007, the defendant — a college graduate who had obtained a master's degree in business administration while in Nigeria — opened Above All Home Care and Medical Supply, Inc. (Above All), a DME supplier. The following year, Above All gained Medicare approval, which authorized it to bill Medicare directly after filling DME prescriptions for Medicare beneficiaries.

Despite securing this certification, the defendant's business lagged. His fortunes changed dramatically when, in 2009, he entered into a business arrangement with John Nasky. The defendant had known Nasky for two years both through their mutual involvement in the community of Nigerian immigrants in the Boston area and through the defendant's publication of a magazine covering Nigerian-American cultural and social events as far away as Texas.

The two men traveled in the same social circles and often saw each other at social events.

Nasky operated his own medical supply and medical billing business with an office in Massachusetts. He represented himself as having a client base in Texas. Nasky had a problem: in June of 2008, his supply company had been placed on payment suspension by Medicare due to a suspicion of fraudulent billing. Nasky had prescriptions to fill and inventory in Texas, but he could not bill Medicare and expect to get paid. So Nasky and the defendant reached an agreement: in exchange for a supply of blank Above All forms and the right to bill Medicare in Above All's name, Nasky would obtain DME prescriptions for Medicare beneficiaries, fill them from his inventory in Texas, and bill for the prescribed equipment in Above All's name. Whatever proceeds Above All received would be split 65% to Nasky and 35% to the defendant. This was easy money for the defendant, who had to do no more than maintain his storefront in Massachusetts and funnel money to Nasky when Medicare paid Above All.

The scheme was fraudulent through and through: the Above All billings submitted by Nasky were based largely on illicitly obtained Medicare beneficiary identification numbers, forged prescriptions, and reimbursement requests for unnecessary medical equipment that in many instances was never delivered.

The plotters prospered: Above All billed Medicare for over $1,000,000 of DME between February and May of 2009 and received payments of more than $400,000. But these halcyon days did not last long. In July, Nasky was charged with Medicare fraud as a result of his involvement in a separate scheme. Above All submitted no further claims to Medicare after that time, and its Medicare provider status was subsequently terminated.

In due course, a federal grand jury sitting in the District of Massachusetts indicted the defendant on one count of conspiracy to commit health-care fraud, see 18 U.S.C. § 1349, four substantive counts of health-care fraud, see id. §§ 2, 1347, and one count of making a false statement to the government, see id. § 1001. During an eight-day trial, the defendant maintained that his business arrangement with Nasky was above board, that he was an innocent dupe, and that he did not know at the time that any of the claims submitted were bogus. The jury rejected his defense, finding him guilty on four counts.[1] The district court imposed a 42-month term of immurement, and this timely appeal followed.

## II. ANALYSIS

In this venue, the defendant challenges certain of the district court's evidentiary rulings, the sufficiency of the government's proof, and the way in which the court calculated loss

_____

[1] One substantive health-care fraud charge was voluntarily dismissed by the government. See Fed. R. Crim. P. 48(a). The jury acquitted the defendant on the false statement count.

-4-

in constructing his guideline sentencing range.  We examine these plaints one by one.

### A. Evidentiary Rulings.

The defendant reproves the district court's admission of evidence relating to Nasky's reputation and criminal history.  We describe what transpired before addressing the defendant's argument.

Prior to trial, the defendant moved in limine to preclude the government from adducing evidence that Nasky was known as a "419" — a slang term in the Nigerian-American community for "crook."[2]  The district court denied the motion subject to "the court's policing of the boundaries of any so-called '419' evidence."

At trial, the government sought to show the defendant's guilty knowledge through, inter alia, his awareness of Nasky's reputation in the social circles that both of them frequented.  To this end, the government called Sunday Joseph Edem (Nasky's coconspirator in a different fraud), who testified over objection that Nasky was "very flamboyant . . . . [a]lways dressing — showing off, like we call — in Nigeria . . . '419.'"

Edem later testified, again over objection, that Nasky carried on a lifestyle in which he always wanted to be noticed and

---

[2] The derivation of this term is direct: section 419 of chapter 38 of the Nigerian criminal code makes it a felony to commit theft by false pretenses.

treated like a celebrity or a "man of the hour." Without objection, Edem went on to testify how Nasky drew attention to himself at restaurants by paying everyone's bill or even tossing money out of buckets at parties as people followed him. In the same vein, Ana Gonzalez (who had been employed in Nasky's Massachusetts office) testified without objection that Nasky often wore distinctive clothing and gold necklaces and rings.

When asked specifically whether Nasky had a particular reputation in the community, Edem responded: "He had a reputation that you couldn't trust him with money. . . . You couldn't trust him with your wife . . . . You could not trust him in a business deal." The jury also heard that Nasky had been convicted of health-care fraud in 2000; that he was arrested on July 29, 2009 for his participation in a health-care fraud that did not involve the defendant; and that he later pleaded guilty to the latter charges. The defendant himself elicited the information regarding Nasky's 2000 conviction, and he failed to object to the admission of evidence concerning Nasky's 2009 arrest and conviction.

In his summation, the prosecutor referenced the testimony of both Edem and Gonzalez, stating:

> Could the defendant really not have known that Nasky was a fraud? . . . You heard testimony from [Edem]. . . . Remember his description about Nasky, the way he looked, the ridiculous jewelry that he wore, the particular way that he carried himself, with the money being thrown [out of] the buckets? . . . Ana Gonzalez also testified that Nasky

-6-

wore distinctive gold jewelry . . . . There were warning signs flashing everywhere that [Nasky] was not an honest businessman, someone not to be trusted.

The prosecutor added: "[Y]ou now know that Nasky was someone who previously went to prison. . . . Is it really plausible that the defendant didn't know that either?"

The defendant now contends that the district court abused its discretion in admitting the 419 testimony and other evidence of Nasky's appearance, reputation, and prior bad acts.  This evidence, he says, was not admissible for any proper purpose and unfairly prejudiced him.  The defendant adds that the prosecutor's summation (to which no contemporaneous objection was made) improperly capitalized on evidence of Nasky's lifestyle and criminal history, in effect inviting the jury to infer guilt by association.

We ordinarily review a district court's rulings admitting or excluding evidence for abuse of discretion.  See United States v. Gobbi, 471 F.3d 302, 311 (1st Cir. 2006).  But when a party has failed to object at trial either to an evidentiary ruling or to closing argument, our review is for plain error.  See United States v. Raymond, 697 F.3d 32, 37-38 (1st Cir. 2012); United States v. Sepulveda, 15 F.3d 1161, 1188 (1st Cir. 1993).  Here, the defendant objected to only some bits and pieces of the evidentiary mosaic that he now challenges, and much of that mosaic came in without objection.

In a veiled effort to skirt this looming obstacle, the defendant implies that his pretrial motion in limine served to preserve his objection to all of the evidence regarding Nasky's reputation and prior bad acts. But this is a bridge too far: where, as here, a trial court "tentatively denies a pretrial motion in limine, or temporizes on it," any objections to the contested evidence must be renewed at trial. United States v. Noah, 130 F.3d 490, 496 (1st Cir. 1997). Elsewise, plain error review obtains. See Raymond, 697 F.3d at 38.

At bottom, we are faced with a situation in which a handful of the district court's challenged evidentiary rulings engender abuse of discretion review while the remainder engender plain error review. Still, we see no need to dismantle the evidentiary mosaic piece by piece. Even assuming, favorably to the defendant, that abuse of discretion review applies throughout, the defendant's challenge fails.

To begin, we set to one side the defendant's lament about the 419 terminology and the evidence of Nasky's flamboyant habits and attire. The only definition of "419" related to the jury was that the numerals referred to a "show off," and the meaning of the numerals is not otherwise common knowledge. Consequently, Edem's use of this term simply became part of the evidentiary array that illustrated Nasky's attention-getting dress and lifestyle.

This evidence, along with the government's references to it in closing argument, may have needlessly embellished the jury's image of Nasky. Nevertheless, it could not have carried great weight in proving the defendant's knowledge of fraud. Whether it served, though, as a basis for an inference that fit as a piece of a larger picture is a question that the jurors were fairly left to answer.

Next, we reject the defendant's assertion that the evidence of Nasky's reputation as a con man was barred by Federal Rule of Evidence 404. Rule 404(a)(1) precludes the admission of evidence of "a person's character or character trait" for the purpose of proving that "on a particular occasion [that] person acted in accordance with the character or trait." That same evidence may be admitted, though, when it has special relevance to an issue in the case (such as knowledge or intent), as long as neither bad character nor propensity is a link in the inferential chain. See United States v. Salameh, 152 F.3d 88, 123 (2d Cir. 1998); see also United States v. Varoudakis, 233 F.3d 113, 118 (1st Cir. 2000) (discussing "special relevance" in context of Federal Rule of Evidence 404(b)).

In the case at hand, the evidence of Nasky's reputation in the community was specially relevant: it was competent to show that when the business arrangement evolved, Nasky's reputation should have forewarned the defendant against taking his

representations at face value. After all, evidence of a person's reputation may be admitted to show the knowledge or state of mind of some other person. For example, in an extortion case, a defendant's reputation for violence or association with organized crime may be admitted to show the victim's state of mind, including his reasonable belief in the defendant's threat of violence. See, e.g., United States v. Goodoak, 836 F.2d 708, 714-15 (1st Cir. 1988); United States v. Russo, 708 F.2d 209, 214 (6th Cir. 1983). Similarly, a tenant's reputation as a drug dealer may be admitted to show a landlord's knowledge that the tenant was using the premises for drug trafficking. See, e.g., United States v. Certain Real Prop. & Premises, 945 F.2d 1252, 1260 (2d Cir. 1991). So it is here: evidence of Nasky's reputation as a fraudster was admissible to prove the defendant's knowledge that the business venture that Nasky proposed was a scam.

In an effort to snatch victory from the jaws of defeat, the defendant asserts that the reputation evidence should not have been admitted because proof was lacking that the defendant knew of Nasky's reputation for fraud. This assertion is triply flawed. For one thing, the defendant failed to challenge the admission of the reputation evidence in the court below on this ground. Although the defendant objected to this evidence on relevancy grounds, an objection to the admission of evidence on one ground does not preserve other grounds for appeal. See United States v.

-10-

Holmquist, 36 F.3d 154, 168 (1st Cir. 1994); see also Fed. R. Evid. 103(a)(1). For another thing, the defendant's opening brief in this court never raised the lack-of-knowledge point. While the defendant did advance the argument in his reply brief, that was too little and too late. See United States v. Torres, 162 F.3d 6, 11 (1st Cir. 1998); Sandstrom v. ChemLawn Corp., 904 F.2d 83, 86 (1st Cir. 1990).

Even assuming that this argument was merely forfeited rather than waived, there was surely no plain error in admitting the reputation evidence. Other proof allowed the jury to infer that the defendant had the opportunity to learn the gist of what Edem knew about Nasky's reputation in their shared community. After all, the defendant knew Nasky personally long before the scheme began and told investigators that he and Nasky traveled in the same circles. Given this predicate, there was no clear or obvious error in the admission of the reputation evidence. See United States v. Duarte, 246 F.3d 56, 60 (1st Cir. 2001) (requiring, at a minimum, "clear or obvious error" to show plain error and overcome a forfeiture).

Evidence of Nasky's 2009 arrest was also admissible. That evidence was introduced not to show Nasky's bad character but, rather, to show why the defendant's dealings with Nasky came to an end. Such evidence may be admitted in a conspiracy case to show the background and development of the conspiratorial relationship

-11-

or to fill in details of the plot.  See United States v. Escobar-de Jesús, 187 F.3d 148, 169 (1st Cir. 1999); United States v. Pitre, 960 F.2d 1112, 1119 (2d Cir. 1992).

The prosecutor's summation does not change this calculus. Once evidence is properly introduced, either party may ask the jury to draw reasonable inferences from it concerning issues that are fairly in the case.  See United States v. Pires, 642 F.3d 1, 14 (1st Cir. 2011); United States v. O'Shea, 426 F.3d 475, 485 (1st Cir. 2005).  That is what happened here.  The prosecutor argued simply that Nasky's appearance and self-promotion gave some warning signs to the defendant that Nasky was not a legitimate businessman.

Similarly, we reject the defendant's muddled suggestion that the evidence of Nasky's prior conviction for fraud was barred by Rule 404.  To be sure, Rule 404(b)(1) precludes the admission of evidence of "a crime, wrong, or other act" to prove propensity. But that proscription does not apply at all in the circumstances of this case: Nasky's 2000 conviction was not brought up by the government but, rather, by the defendant.[3]  A party cannot be heard to complain about the prejudicial effect of evidence that he himself introduced.[4]  See United States v. Majeroni, 784 F.3d 72,

_____

[3] The defendant does not assign error to the admission of evidence of Nasky's conviction following his 2009 arrest (and, in any event, that evidence was admitted without objection).

[4] We add that when the prosecutor referred to the conviction in his closing argument, he did so only for the permissible purpose of showing the defendant's knowledge and intent.  See Raymond, 697

77 (1st Cir. 2015); <u>United States</u> v. <u>Munson</u>, 819 F.2d 337, 342 (1st Cir. 1987).

The defendant further posits that the admission of the reputation evidence, in concert with the evidence of Nasky's 2000 conviction and 2009 arrest and conviction, transgressed Federal Rule of Evidence 403. This is a heavy lift: "[O]nly rarely — and in extraordinarily compelling circumstances — will we, from the vista of a cold appellate record, reverse a district court's on-the-spot judgment concerning the relative weighing of probative value and unfair effect." <u>Raymond</u>, 697 F.3d at 38 (quoting <u>Freeman</u> v. <u>Package Mach. Co.</u>, 865 F.2d 1331, 1340 (1st Cir. 1988)). There are no such compelling circumstances here. The central issue in the case was whether the defendant was hoodwinked by Nasky (as he claimed) or whether he knowingly participated in the scheme to defraud Medicare (as the government claimed). Evidence of Nasky's reputation in their shared community was probative as to whether the defendant knowingly participated in or was willfully blind to the fraudulent design of the scheme that Nasky proposed. <u>See</u>, <u>e.g.</u>, <u>Noah</u>, 130 F.3d at 496 (concluding that when defendant "staked his defense on the proposition that he was an innocent dupe, victimized by a lawless employee," prior bad act evidence was

_____

F.3d at 38; <u>see</u> <u>also</u> Fed. R. Evid. 404(b)(2). The conviction was never used by the government to show propensity.

highly relevant to show "guilty knowledge, the existence of a criminal plan, and the absence of mistake").

Nor can it be said that the district court abused its broad discretion in ruling that the probative value of this evidence was not substantially outweighed by the prospect of unfair prejudice.  Before the need to exclude particular evidence arises, "there must be a significant tipping of the scales against the evidentiary worth of the proffered evidence."  United States v. Aquilar-Aranceta, 58 F.3d 796, 800 (1st Cir. 1995) (internal quotation mark omitted).  Here, the evidence bore on a critical element of the charged crimes — the defendant's mens rea.  Although the evidence painted a manifestly unattractive picture of Nasky and certainly hurt the defendant's chances at trial, Rule 403 has never been interpreted to bar evidence simply because it is prejudicial. See United States v. Rodriquez-Estrada, 877 F.2d 153, 156 (1st Cir. 1989) ("By design, all evidence is meant to be prejudicial[.]") The rule bars only unfair prejudice, see id., and we discern no unfair prejudice here.

The prosecutor's closing argument does not shift the balance.  The prosecutor scrupulously refrained from suggesting that Nasky's character or reputation alone evidenced the defendant's guilt.  Nor did he ask the jury to infer, either expressly or by implication, that the defendant must have been complicit in the scheme merely because he associated with Nasky.

Instead, the prosecutor used the challenged evidence only as one of several points supporting the government's position that the defendant must have realized the fraudulent nature of his dealings with Nasky.

## B.  **Sufficiency of the Evidence.**

We turn next to the defendant's challenge to the sufficiency of the evidence.  This challenge was preserved by means of a motion for judgment of acquittal, see Fed. R. Crim. P. 29, which the district court denied.  We review this denial de novo. See United States v. Gomez, 255 F.3d 31, 35 (1st Cir. 2001).

In evaluating a challenge to the sufficiency of the evidence, a reviewing court must scrutinize all the evidence in the light most hospitable to the government's theory of the case.  See id.  The court then must determine whether the evidence, when viewed in that light and with all permissible inferences drawn in favor of the verdict, would allow a "rational factfinder to conclude beyond a reasonable doubt that the defendant committed the charged crime."  Id. (internal quotation mark omitted).  Under this regime, all credibility disputes must be resolved in favor of the verdict.  See United States v. Piper, 298 F.3d 47, 59 (1st Cir. 2002); United States v. Martin, 228 F.3d 1, 10 (1st Cir. 2000). So, too, the court may not speculate as to the weight afforded to individual pieces of evidence: rather, it must recognize that the jury need not evaluate each piece of evidence in isolation but may

draw conclusions from the evidence as a whole.  See Martin, 228 F.3d at 10; United States v. Spinney, 65 F.3d 231, 234 (1st Cir. 1995).

In the last analysis, the government need not disprove every theory compatible with the defendant's innocence.  See Spinney, 65 F.3d at 234.  It is enough that the verdict is supported by a "plausible rendition of the record."  Gomez, 255 F.3d at 35 (internal quotation mark omitted).

We move now from the general to the specific, starting with the conspiracy count.  The defendant does not challenge the government's proof of the existence of the conspiracy.  Instead, he zeroes in on the two remaining elements of the offense, arguing that the evidence was too thin to prove either that he knew of the existence of the conspiracy or that he knowingly participated in it.  Ably represented, he slices and dices the government's case, characterizing it as circumstantial and asserting that each piece of circumstantial evidence, viewed in isolation, admits of an equally plausible inference compatible with innocence.  On this view, he submits, the jury must perforce have entertained a reasonable doubt as to his guilt.  See United States v. Flores-Rivera, 56 F.3d 319, 323 (1st Cir. 1995).

With respect to the three substantive counts of health-care fraud, the defendant makes much the same argument. Specifically, he asserts that the evidence was insufficient to

prove his knowledge of, and his specific intent to execute, a fraud on Medicare vis-à-vis each of the named beneficiaries.

To prove conspiracy to commit health-care fraud under 18 U.S.C. § 1349, the government must prove beyond a reasonable doubt that an agreement existed to commit the underlying substantive offense (here, health-care fraud under 18 U.S.C. § 1347), that the defendant knew of the agreement, and that he voluntarily joined it with the intent to commit the underlying offense. See United States v. Willett, 751 F.3d 335, 339 (5th Cir. 2014); Gomez, 255 F.3d at 35. Guilty knowledge and intent may be proven solely by circumstantial evidence. See United States v. O'Brien, 14 F.3d 703, 706 (1st Cir. 1994).

In this case, the government adduced evidence from which a rational jury could have concluded that the defendant both knew of the existence of the conspiracy to defraud Medicare and voluntarily chose to participate in it. Nasky did not come to the defendant as a stranger: the two men had known each other for a substantial period of time, traveled in the same circles, and exchanged telephone calls on average monthly during the two years preceding the birth of the scheme.

What is more, the terms of their business arrangement were highly suspicious. Nasky offered to give the defendant 35% of the revenue from prescriptions and inventory already in hand in exchange for nothing more than the use of Above All's name and

-17-

Medicare provider number. Things that sound too good to be true usually are, and the defendant knew that he was being paid substantial sums for doing nothing more than giving Nasky free rein with Above All's forms and provider number and remitting Nasky's share to him when payments were received. Furthermore, the jury rationally could have found that the defendant learned that Nasky was no longer able to bill Medicare through his own company — a fact that Nasky freely shared with others such as Edem and Gonzalez. From that point forward, the grounds for suspicion escalated.

There was more. Remittance notices, received by Above All, accompanied each Medicare payment. Each notice set out information about the particular beneficiary, the item or items billed for that beneficiary, and the amount Medicare paid for each such item. For 67 out of 88 Texas-based beneficiaries, Above All billed Medicare in the same amount for the same type of equipment — typically, $12,650 for a power wheelchair, related accessories, multiple braces, and a heat lamp. Even the most fervent believer in coincidence would have raised an eyebrow over those remarkable similarities. See, e.g., United States v. Cruz-Arroyo, 461 F.3d 69, 75 (1st Cir. 2006) (concluding that one "would have to believe in the Tooth Fairy" to believe a certain set of facts "merely coincidental" (internal quotation mark omitted)).

Other evidence made pellucid that the linkage forged between the defendant and Nasky was not a legitimate arm's-length business relationship. The defendant transferred substantial sums to Nasky, allegedly for equipment purchases — yet during the Medicare investigation he was unable to produce even a single invoice to support his averment that Above All actually bought equipment through Nasky. To add fuel to the fire, these monetary transfers took place in unorthodox ways: sometimes in cash, sometimes by wire transfer, sometimes by check, and not always to Nasky or to his business (on occasion, monies were sent to Nasky's wife or to her beauty supply company). Even after Nasky was arrested in 2009, the defendant sent him money in jail.

Importantly, Nasky told the defendant that he needed his share of the proceeds quickly in order to "take care of some people." The defendant's awareness of that fact was strong evidence of his guilty knowledge — and his awareness was heightened when, at a later point during the conspiracy, Nasky stated to the defendant in so many words that he paid people to obtain prescriptions.

The pattern of telephone calls between the defendant and Nasky likewise indicated a connection more sinister than one would expect of a business owner and an independent service provider. For example, on May 6, 2009 — at the height of the fraud — a Medicare auditor conducted an unannounced site inspection at Above

-19-

All. During this inspection, the auditor reviewed a sampling of Above All's customer files and compared its inventory to its recent Medicare billings. The auditor asked the defendant to provide invoices to authenticate Above All's recent equipment billings because its inventory seemed woefully scant in comparison to those billings. On that same day, the defendant and Nasky exchanged 11 telephone calls. One of those occurred between the auditor's arrival at Above All and the start of the defendant's interview with her, and seven others occurred after the site visit had concluded. On the following day, there were seven more calls between the defendant and Nasky. Although the defendant tries to put an innocent face on this avalanche of calls, the jury reasonably could have inferred that the avalanche was sparked by more than a simple request for copies of invoices.

There was still more. The evidence indicates that the defendant hid his business relationship with Nasky. Over 90% of Above All's claims involved Texas-based beneficiaries. Yet, the auditor who conducted the May 6 site visit testified that the files she reviewed concerned only Massachusetts-based beneficiaries (none from Texas). Furthermore, when she requested information about Above All's inventory supply, the defendant responded that he purchased equipment from another (legitimate) company and never said a word about his significant ties with Nasky. Nor was the defendant's penchant for keeping people in the dark about his

-20-

supposedly legitimate dealings with Nasky limited to the Medicare auditor. A witness who worked for Above All throughout 2009 testified that he was not aware that the defendant had any business relationship with Nasky.

Finally, the reputation evidence buttresses the other evidence. Nasky offered the defendant a business arrangement that was wildly unconventional and promised great rewards for minimal effort. Given Nasky's known reputation as a fraudster,[5] the jury could have used this evidence as one of several pieces of evidence contributing to a reasonable inference of the defendant's guilty knowledge and willing participation. See, e.g., United States v. Mitchell, 31 F.3d 628, 631, 633 (8th Cir. 1994).

To say more would be to paint the lily. We agree with the defendant that the tapestry of the government's case is woven from strands of circumstantial evidence, and many of these strands, taken singly, might admit of an innocent explanation premised on the defendant's professed naivety and Nasky's deftness as a fraudster. But the sum of an evidentiary presentation often is greater than its individual parts. See Bourjaily v. United States,

---

[5] Edem's testimony largely concerned Nasky's reputation in Texas. But the defendant, wearing his journalist's hat, traveled to Texas on several occasions to report on social functions in the Nigerian-American community for his magazine. The defendant's presence in Texas, together with evidence that he knew Nasky well, that the two spoke regularly, and that they traveled in the same social circles, afforded a sufficient foundation for a finding that he was aware of Nasky's dubious reputation in Texas as well as Massachusetts.

483 U.S. 171, 180 (1987); Harrington v. Aggregate Indus. - Ne. Region, Inc., 668 F.3d 25, 34 (1st Cir. 2012).  Particularly in fraud cases, it is familiar lore that the government may carry its burden of proof wholly through circumstantial evidence.  See, e.g., O'Brien, 14 F.3d at 706.

Our duty here is not to reweigh the evidence, see Martin, 228 F.3d at 10, but to evaluate whether a rational jury could have concluded beyond a reasonable doubt that the defendant knowingly and willfully conspired to commit health-care fraud, see Willett, 751 F.3d at 339; Gomez, 255 F.3d at 35.  Given the weight and texture of the evidence as a whole, we believe that the jury, using common sense to draw a series of reasonable inferences, reached just such a conclusion.[6]  See Spinney, 65 F.3d at 238 ("Chains of inference are a familiar, widely accepted ingredient of any process of ratiocination.  This method of reasoning . . . should not be forbidden to a criminal jury.").

We need not tarry over the sufficiency of the evidence on the three substantive counts of Medicare fraud.  The district court's instructions permitted the jury to convict the defendant on these charges either as a principal, see 18 U.S.C. § 1347, or as an aider and abettor, see id. § 2.

_____

[6] In light of this holding, we have no occasion to consider the government's alternative theory that the defendant's guilty knowledge was proven by evidence of his willful blindness.

Proof of a violation of 18 U.S.C. § 1347 requires a showing that the defendant knowingly and willfully executed a scheme to defraud a government health-care program. See Willett, 751 F.3d at 339. In criminal cases, willfulness generally means that an act was undertaken with a "bad purpose," that is, with knowledge that the act is unlawful. Bryan v. United States, 524 U.S. 184, 191-92 (1998). Aiding and abetting requires proof that the defendant "consciously shared the principal's knowledge of the underlying criminal act, and intended to help the principal" accomplish it. United States v. Taylor, 54 F.3d 967, 975 (1st Cir. 1995). In the case of health-care fraud, proof of guilt either as a principal or as an aider or abettor requires proof of specific intent, which may be established by circumstantial evidence. See Willett, 751 F.3d at 339; Taylor, 54 F.3d at 975.

Whatever the theory, the evidence here is sufficient to support the jury's verdict on each substantive count of health-care fraud. Each count was premised on a Medicare claim submitted by Above All for a specified Texas-based beneficiary who testified at trial. The circumstances of these claims shared many of the badges of fraud that characterized the overall scheme. All of the claims were predicated on forged prescriptions; used an identical (fraudulent) diagnosis code; and resulted in a billing by Above All

-23-

to Medicare for no fewer than 11 articles of unnecessary and/or unwanted medical equipment.[7]

Viewing this evidence in the reflected light of the abundant evidence of widespread fraud, we think it without serious question that a rational jury could have concluded — as this jury did — that the defendant knowingly and willfully both perpetrated and aided and abetted health-care fraud vis-à-vis these beneficiaries.

### C. **Sentencing**.

The defendant's final assignment of error implicates his sentence. At the disposition hearing, the district court set the guideline sentencing range (GSR) at 51 to 63 months, premised on a criminal history category of I and a total offense level of 24. The offense level was driven in large part by a 16-level enhancement for an intended loss of more than $1,000,000 but not more than $2,500,000. See USSG §2B1.1(b)(1)(I)-(J). The court sentenced the defendant to a below-the-range incarcerative term of 42 months.

On appeal, the defendant contests only the loss calculation. He argues that the sentencing court erred by treating the total amount billed to Medicare as intended loss, failing to credit repayments that the defendant made to Medicare, and

---

[7] To make the cheese more binding, one of these three beneficiaries identified the defendant as the person who had delivered the unwanted medical equipment to her home.

-24-

including billings for certain purportedly legitimate claims. We review the district court's application of the relevant sentencing guidelines (including its selection of a loss-calculation method) de novo. See United States v. Alphas, ___ F.3d ___, ___ (1st Cir. 2015) [No. 14-2228, slip op. at 9]; United States v. Pennue, 770 F.3d 985, 991 (1st Cir. 2014); United States v. Stergios, 659 F.3d 127, 135 (1st Cir. 2011).

The guideline that deals with theft and fraud offenses, including health-care fraud, provides that the defendant's offense level should be enhanced in proportion to the loss associated with the offense. See USSG §2B1.1(b)(1); id. at App. A. In determining the loss amount, the sentencing court must consider the greater of actual or intended loss. See United States v. Innarelli, 524 F.3d 286, 290 (1st Cir. 2008); USSG §2B1.1, comment. (n.3(A)). Actual loss is the "reasonably foreseeable pecuniary harm that resulted from the offense." USSG §2B1.1, comment. (n.3(A)(i)). Intended loss is "the pecuniary harm that was intended to result from the offense," including harm that "would have been impossible or unlikely to occur." Id. at n.3(A)(ii). These principles inform the defendant's assignment of sentencing error.

The parties — who agree on little else — do not dispute that actual loss is no greater than $446,712 (the total paid by Medicare to Above All). Here, however, the sentencing court

thought that intended loss controlled — and its calculation of intended loss is more controversial.

At sentencing, the government urged the court to treat as intended loss the face amount of the fraudulent claims that Above All billed to Medicare ($1,097,160). This amount includes the claims associated with 90 beneficiaries, two from Massachusetts and 88 from Texas. The defendant countered that the amount billed to Medicare was not a suitable basis for a finding of intended loss. He argued instead that the proper measure of intended loss was the amount actually paid by Medicare. In support, he noted that Medicare pays claims according to a fee schedule predicated in part on a percentage of the amount claimed and, therefore, always pays less than the amount billed. See 42 C.F.R. § 414.210 (explaining that Medicare generally pays for DME "on the basis of 80 percent of the lesser of . . . [t]he actual charge for the item [or] [t]he fee schedule amount for the item"). The court below resolved this contretemps in favor of the government.[8]

Even though the defendant was sentenced in 2013, the district court applied the 2008 edition of the sentencing guidelines (the edition in effect when the offenses of conviction

_____

[8] The defendant asserts that the district court mistakenly thought that he was arguing for a sentence based on actual loss, not intended loss. A careful reading of the sentencing transcript persuades us that the court understood the thrust of the defendant's argument.

-26-

occurred).[9]  The court proceeded to treat the amount billed to Medicare as evidence of the amount of intended loss, set the loss amount in excess of $1,000,000, and boosted the defendant's offense level by 16 levels.  The defendant assigns error to the court's methodology.

Under the 2008 guidelines, as now, a sentencing court is permitted to determine the amount of intended loss based on a reasonable estimate.  See Alphas, ___ F.3d at ___ [slip op. at 19]; United States v. McCoy, 508 F.3d 74, 79 (1st Cir. 2007).  Compare USSG §2B1.1, comment. (n.3(C)) (Nov. 2014), with id. (Nov. 2008). Intended loss may include even those losses that were "impossible or unlikely to occur," such as an insurance fraud where the claim exceeds the insured value.  USSG §2B1.1, comment. (n.3(A)(ii)).  In cases of health-care fraud, courts have regularly held that the amount billed to Medicare is prima facie evidence of intended loss. See, e.g., United States v. Isiwele, 635 F.3d 196, 203 (5th Cir.

---

[9] In 2011, the Sentencing Commission amended the commentary to USSG §2B1.1 to make explicit that where a defendant is convicted of an offense involving theft from a government health-care program, "the aggregate dollar amount of fraudulent bills submitted to the . . . program shall constitute prima facie evidence of the amount of the intended loss, i.e., is evidence sufficient to establish the amount of the intended loss, if not rebutted."  USSG App. C, Amend. 749 (codified at USSG §2B1.1, comment. (n.3(F)(viii))).  Although this amendment may have applied retroactively, see, e.g., David v. United States, 134 F.3d 470, 476 (1st Cir. 1998); Isabel v. United States, 980 F.2d 60, 62 (1st Cir. 1992), the government has not pressed that point.  Consequently, we deem any such argument waived.  See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).

2011); <u>United States</u> v. <u>Miller</u>, 316 F.3d 495, 504 (4th Cir. 2003). These decisions draw their essence from the long-standing presumption in the law that a "bill is a bill," that is, that the face amount of a bill is presumptive evidence of the amount that the person who submits it expects to obtain.  <u>Miller</u>, 316 F.3d at 504.  This is a variation of the hoary rule that the face value of a fraudulent instrument may be treated as evidence of the amount that the fraudster intended to swindle.  <u>See</u>, <u>e.g.</u>, <u>Stergios</u>, 659 F.3d at 135-36; <u>United States</u> v. <u>Blastos</u>, 258 F.3d 25, 30 (1st Cir. 2001); <u>United States</u> v. <u>Geevers</u>, 226 F.3d 186, 192-93 (3d Cir. 2000); <u>see</u> <u>also</u> <u>United States</u> v. <u>Alli</u>, 444 F.3d 34, 39 (1st Cir. 2006) (using limits on stolen credit cards as measure of intended loss).

We most recently followed this practice in <u>Alphas</u>. There, we held — in a case involving multiple insurance claims "demonstrably rife with fraud" — that the sentencing court could rely on the face amount of the claims as evidence of intended loss. <u>See</u> <u>Alphas</u>, ___ F.3d at ___ [slip op. at 19].  "[T]he burden of production will then shift to the defendant, who must offer evidence to show" why the loss figure should be set at a lower amount.  <u>Id.</u> at ___ [slip op. at 19].  "After the record is fully formed, the sentencing court must determine the amount of loss that the government (which retains the burden of proof) is able to establish."  <u>Id.</u> at ___ [slip op. at 19].  That determination need

only reflect "a reasonable estimate of the loss."  <u>Id.</u> at ___ [slip op. at 19](quoting USSG §2B1.1, comment. (n.3(C))).

Applying this case law, we hold that the sentencing court did not err in treating the amounts billed to Medicare as presumptive evidence of the amount of intended loss.  But this does not end the matter: the defendant argues that even if the sentencing court appropriately used the amounts billed to Medicare as a starting point, he rebutted any presumption that those amounts were a suitable proxy for intended loss.  This argument will not wash.

Intended loss is the loss that a person standing in the defendant's shoes reasonably would have expected to cause at the time he perpetrated the fraud.  <u>See</u> <u>id.</u> at ___ [slip op. at 9-10]; <u>Innarelli</u>, 524 F.3d at 291.  The test for intent is based primarily on the defendant's objectively reasonable expectations at the time of the fraud.  <u>See</u> <u>Stergios</u>, 659 F.3d at 135; <u>Innarelli</u>, 524 F.3d at 291 & n.6; <u>McCoy</u>, 508 F.3d at 79.  Even so, the defendant's subjective intent plays a role in this analysis.  <u>See</u> <u>Innarelli</u>, 524 F.3d at 291 & n.6; <u>McCoy</u>, 508 F.3d at 79.

The defendant argues that he intended to defraud Medicare of no more than what Medicare actually paid.  In support, he says that any DME provider would have known that Medicare would not pay the full amount billed.  But this is too myopic a view: it overlooks that the defendant, at the time of the fraud, was a DME

provider who had joined forces with an inveterate fraudster in an attempt to bilk Medicare out of as much as the traffic would bear. There is no reason to think that a fraudster in that position would have intended to scoop anything less than as much as he could from Medicare. See Geevers, 226 F.3d at 193 (observing that even though a check kiter "may not have expected to get it all, he could be presumed to have wanted to"). At bottom, the defendant's problem is that, professing great ignorance about the whole scheme, he offered no direct evidence that he expected Medicare to pay less than his cohort billed; and the indirect evidence that a reasonable person would have so expected is not strong. In particular, there is no evidence in this record that would have compelled the district court to find that the defendant knew that the amount billed was more than the scheduled amounts that Medicare routinely paid.

The defendant has a final argument related to the loss amount. He contends that he displayed an entitlement to credits that he did not receive. Some background is needed to put this contention into perspective.

The sentencing court arrived at $1,097,160 for intended loss. The defendant submits that this figure should be offset by $90,838 based on (i) sums that he refunded to Medicare during the course of the fraudulent scheme (totaling $46,588) and (ii) sums associated with purportedly legitimate claims for four specific

beneficiaries (totaling $44,250).  But even if the defendant is correct — a matter on which we take no view — these offsets would not reduce the intended loss amount below the cutoff point for the 16-level enhancement.  See USSG §2B1.1(b)(1)(I) (establishing floor for enhancement at more than $1,000,000).  Accordingly, resolving the defendant's contentions would serve no useful purpose; any error in failing to offset these amounts would be harmless.  See Williams v. United States, 503 U.S. 193, 203 (1992); United States v. Gerhard, 615 F.3d 7, 34 (1st Cir. 2010).

## III.  CONCLUSION

We need go no further.  For the reasons elucidated above, the defendant's conviction and sentence are

**Affirmed.**